# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2990

_____

United States of America,          *
                                       *

          Appellee,       *
                                       *

   v.                   *
                                       *

Denell N. Syslo,             *
                                       *

          Appellant.     *

_____            Appeals from the United States
                                     District Court for the District

No. 01-2992                of Nebraska.

_____

                                   [TO BE PUBLISHED]

United States of America,         *
                                       *

          Appellee,       *
                                       *

   v.                   *
                                       *

Gregory T. Syslo,           *
                                       *

          Appellant.     *

_____

Submitted:  December 10, 2001
Filed:  September 6, 2002 - Corrected 9/16/02

_____

Before McMILLIAN and MURPHY, Circuit Judges, and BATTEY,[1] District Judge.
_____

PER CURIAM.

Gregory T. Syslo and his wife Denell were charged with federal offenses in connection with a bank burglary. Gregory was sentenced to 27 months after pleading guilty to bank burglary in violation of 18 U.S.C. § 2113(a), and Denell was sentenced to 21 months on her plea to money laundering in violation of 18 U.S.C. §§ 1957 and 2. Both moved to suppress statements they had made to Lincoln, Nebraska police. A magistrate judge conducted a suppression hearing and made detailed findings of fact, including some findings favorable to the Syslos, but concluded in light of all the evidence that both suppression motions should be denied and so recommended. The district court[2] then conducted a careful de novo review, after which it adopted the magistrate judge's findings of fact and made additional findings. The court also adopted the magistrate judge's recommendation to deny Gregory's suppression motion, but it concluded that Denell's motion should be granted in part. Both Syslos contend on appeal that their statements should have been completely suppressed because they were obtained in violation of their Fifth Amendment rights. We affirm.

I.

In a July 4, 2000 burglary at the National Bank of Commerce, $95,980.45 in cash and $7,237.07 in stamps and cashier checks were taken from a teller bus. Investigators suspected an inside job because wires to the bank's video security

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota, sitting by designation.

[2] The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

system had been cut, bait money had been left behind, Magistrate Judge's Report, Order and Recommendation (Mar. 27, 2001) [Mag. Rep.], at 1, and several master keys were found at the scene, Suppression Hearing Transcript (Mar. 5, 2001) [Hearing Tr.], at 5 (testimony of Inv. Clark). Investigator Randall Clark developed a list of suspects from current and former employees of the bank. Mag. Rep. at 1. Gregory Syslo was on the list because he had previously worked at the bank as a security guard, but he was not initially questioned. Id.

Sandra Myers, one of the other investigators in the police department, told Clark on October 17, 2000 that the bank chief of security considered Gregory a good suspect for the July burglary and was concerned that police had not interviewed him. Id. at 2. Clark ran a vehicle registration check on Gregory which revealed that in August the Syslos had registered the purchase of two automobiles, a 2000 Cadillac Escalade and a 1999 Pontiac Grand Am. Id. Clark called the Department of Motor Vehicles and learned that the vehicles had been purchased in late July at a local dealership and that there were no liens on either. Hearing Tr. at 7 (testimony of Inv. Clark). Employees at the dealership informed Clark that the Syslos had paid for the vehicles with approximately $49,000 in cash which they had taken from a box filled with money. Mag. Rep. at 2.

Gregory had also become a suspect in an unrelated forgery Myers was investigating. Id. She and Clark decided that she would ask Gregory to come to the police station to give a handwriting exemplar in connection with the forgery case and that in the meantime Clark would execute a search warrant at the Syslos' residence in connection with the burglary case. Id. at 2-3.

Gregory arrived at the station on November 1, 2000 and was directed to an interview room at approximately 11 a.m. Id. at 4. Myers testified that she told Gregory that he would be questioned about the forgery investigation, Hearing Tr. at 62, but Gregory denies that he was ever informed about any investigation, see, e.g.,

-3-

id. at 183.  The district court made a finding, however, that Myers had given Gregory the information.  United States v. Syslo, No. 4:00CR3091, at 6 (D. Neb. May 3, 2001) [Dist. Ct. Order].  Myers read Gregory his Miranda rights from a waiver form.  After Myers informed Gregory of his right to have an attorney, Gregory "asked Myers whether he needed an attorney for a handwriting exemplar.  Myers responded 'No,' and stated that reading a person's rights in this situation was 'just a formality.'" Mag. Rep. at 4.[3]  Gregory signed the waiver of rights and began the handwriting exemplar, which took approximately fifty five minutes.  Mag. Rep. at 4.  During that time, Myers and Gregory had a general conversation about work and family.  Id.

Meanwhile Clark and Investigator Teresa Hruza executed the search warrant at the Syslos' residence where Hruza saw a box filled with cash which matched the description of the box seen by the dealership employees.  Id. at 3.  When Hruza asked Denell to accompany the officers to the station, she agreed.  Id.  Since there was nobody available to stay with the Syslos' two young children, they went too and the group arrived at the station shortly before noon.  Id.  After Clark obtained a caretaker to stay with the children, Hearing Tr. at 10 (testimony of Inv. Clark); id. at 95 (testimony of Inv. Hruza), Hruza took Denell to an interview room and read her Miranda warnings from a waiver form.  Mag. Rep. at 5.  Denell signed the form and waived her rights, Government Exhibit 9, but she claims Hruza said that the waiver was a formality and that she could go home if she gave a statement, otherwise she was going to jail.  Hearing Tr. at 154-56.  Hruza denied making these statements, Hearing Tr. at 113-14, and the district court found that even if Hruza had made the statements,

---

[3] Gregory testified that he said "I don't think I need an attorney for this" and that Myers had agreed with him and told him the Miranda waiver was just a formality. Hearing Tr. at 183.  Myers denied making these statements and testified that she never tells suspects that they do not need an attorney.  Id. at 87.  The fact that the magistrate judge did not allude to the officer's conflicting testimony does not necessarily mean that he rejected it.  Cf. Dist. Ct. Order at 2 (unclear whether the magistrate judge made a finding in respect to other conflicting testimony).

Denell had voluntarily waived her rights. Dist. Ct. Order at 2. Denell asked if she could contact her mother in law, and Hruza arranged for an officer to call her. Hearing Tr. at 160 (testimony of D. Syslo).

In the meantime Clark went to Gregory's interview room and told Myers that a box of cash had been found at the Syslo' residence and Denell and the children were at the station. Mag. Rep. at 4. Clark started to ask Gregory about the bank burglary and the automobile purchases. Id. at 4-5. Gregory claimed that he had obtained the cash for the cars from investments on the internet. Id. at 5. Gregory claims that Clark said "[E]ither you tell us the truth or you and your wife are going to jail and your kids are going to a foster home." Hearing Tr. at 186 (testimony of G. Syslo). Clark denied making that statement, Hearing Tr. at 48, and both the magistrate judge and the district court found that he had not. Mag. Rep. at 12; Dist. Ct. Order at 7.

Myers went over to Denell's interview room and reported that Gregory was talking and telling the truth. Mag. Rep. at 5. Myers testified that Denell began to cry and made statements acknowledging that Gregory had robbed the bank. Hearing Tr. at 72. Myers returned to Gregory's interview and informed him that his wife was telling the truth and that now it was his turn. Mag. Rep. at 5.

Gregory continued to deny his involvement and did not believe that his family was at the station. Id. After he asked to see them, Myers showed him two handwritten notes from Denell.[4] Id. Gregory continued to deny his involvement in the burglary and asked to see his children. Myers testified that when the officers showed Gregory a Polaroid photograph of the children with the caretaker, his defiant demeanor changed, his shoulders "slumped forward," and he admitted his

---

[4] The first note said, "Greg I love you. I am telling them what little I know. Boys are ok. Jerm [the older son] upset. Hang on. XO I love." Government Exhibit 5. The second note said: "I love you. Telling what little I know. Boys ok. Am telling truth. I love you Kitty." Government Exhibit 6.

involvement in the burglary.  Hearing Tr. at 76.  See also Mag. Rep. at 6.  Gregory later said, "[T]he reason that I needed this picture [was] to know Denell was here because you guys wouldn't prove this without a confession.  I'm sorry.  You wouldn't.  If it was not for a confession you could not have proved this.  There were no fingerprints.  There's no evidence left."  Dist. Ct. Order at 6-7, quoting Transcript of Gregory Syslo's Recorded Statement (Nov. 1, 2000) [Gregory Tr.], at 6, lines 303-06.  Gregory confessed to the burglary in a recorded statement, answered questions about the forgery investigation, and was taken to the county jail at 1:15 p.m.  Mag. Rep. at 6.

A recorded statement was taken from Denell, starting at 12:24 p.m.  Transcript of Denell Syslo's Recorded Statement (Nov. 1, 2000) [Denell Tr.], at 1. She stated that she had recently come to believe Gregory had committed the crime, id. at 13, lines 642-655, but she denied actual knowledge of it, id. at lines 668-675.  Hruza told Denell that she would not go to jail if she did not lie, id. at 14, lines 744-46, and Denell responded, "If I didn't have my children to worry about I might lie to you thinking that I was gonna save my butt, but if Greg goes away somebody has to be there with my kids and they're my kids," id. at 15, lines 748-50.  The first part of Denell's recorded interview concluded at 1:35 p.m.  Id. at 30, line 1580.

Myers then returned from the jail and told Hruza about Gregory's confession and suggested that she question Denell further.  Gregory had told the investigators that Denell had been with him when he had obtained a master key to the bank, Gregory Tr. at 9, lines 435-38, and that she had helped him count the money the day of the crime, id. at 7, lines 351-58.  The second part of Denell's recorded statement began at approximately 1:40 p.m.  A listener to the recording can hear that Hruza's tone became sharper at this point, and she said, "[Y]ou're trying to protect yourself cause you know right now you're sitting on the line whether you go to jail or you walk out of here with your kids."  Denell Tr. at 33, lines 1703-05.  Denell eventually admitted that she had known before the burglary that Gregory had obtained a master

key, id. at 40, line 2088, and that he told her on the day of the burglary that the proceeds amounted to nearly $100,000, id. at 36, lines 1903-04. She continued to deny that she had actually known in advance that Gregory planned to burglarize the bank. See id. at 41, line 2143 ("The most I ever knew was after the fact."). Denell concluded her statement at 2:02 p.m. and went home with her children. Mag. Rep. at 7.

Gregory was charged with bank burglary in violation of 18 U.S.C. § 2113(a), and he and Denell were both charged with money laundering in violation of 18 U.S.C. §§ 1957 and 2. They moved to suppress their statements, arguing that their Miranda waivers were invalid and that their confessions had been coerced. A magistrate judge made findings of fact and recommended denial of the Syslos' motions. The district court adopted most of the magistrate judge's findings and conclusions after its de novo review, with the important exception that the court suppressed most of the statements made by Denell during the second part of her interview because it found they were the product of coercive questioning and thus involuntary.

The Syslos then both pled guilty under plea agreements which protected their rights to appeal the adverse rulings on their suppression motions. Gregory pled guilty to bank burglary under 18 U.S.C. § 2113(a) and Denell to money laundering under 18 U.S.C. §§ 1957 and 2. Gregory was sentenced to 27 months and Denell to 21 months, but the court ordered that they should serve their sentences consecutively so that their children would always have one parent with them. The court also ordered three years of supervised release for each and restitution in the amount of $103,217.52.

II.

On appeal Gregory argues that his statement should have been suppressed because he waived his Fifth Amendment rights without understanding that he would be interrogated and after Myers had agreed that he did not need a lawyer and said that

the waiver was a formality. He also claims that Clark told him that he and his wife would go to jail and their children to foster homes if he did not tell the truth and that this caused him to make an involuntary confession. He says the district court erred in finding that he had known he would be questioned about the forgery investigation and that Clark had not made the threats. Denell argues that her Miranda waiver was involuntary, and that her entire statement should therefore have been suppressed.

We review factual findings under a clear error standard, and we review de novo conclusions of law based on those factual findings, such as whether a Miranda waiver was valid or a confession was voluntary. United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993) (waiver of Miranda rights); United States v. Casal, 915 F.2d 1225, 1228 (8th Cir. 1990) (voluntariness of confession).

A waiver of the Fifth Amendment privilege against self incrimination is valid only if it is made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id.

The district court found that Gregory had known he would be interrogated about the forgery investigation, and we conclude that this finding is supported by the record. Investigator Myers testified that she definitely had intended to question him about the forgery case, Hearing Tr. at 85, and that prior to administering his Miranda rights she told him they would "probably talk about the forgery," id. at 62. The giving of Miranda warnings is not necessary to obtain a handwriting exemplar, Gilbert v. California, 388 U.S. 263, 266-67 (1967), and the fact that they have been given implies that an officer intends to question the suspect. Moreover, the waiver forms signed by the Syslos referred several times to the fact that the signer would be

-8-

questioned, and the Syslos indicated on the forms that they understood this. Government Exhibits 1 & 9.

Although Gregory was interrogated about the bank burglary before the forgery, the sequence of questioning does not affect the validity of a Miranda waiver. Colorado v. Spring, 479 U.S. 564, 577 (1987); McKee v. Nix, 995 F.2d 833, 837-38 (8th Cir. 1993), cert. denied, 510 U.S. 998 (1993). An officer may change the topic of interrogation without notice because a "suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Spring, 479 U.S. at 577. The dissent argues that Gregory's confession was the product of a constitutionally impermissible bait and switch plan, but there were no findings of police trickery by the district court, see Spring, 479 U.S. at 575, and the Supreme Court "has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights." Id. at 576.

A suspect must clearly and unambiguously request a lawyer in order to trigger his Fifth Amendment right to counsel. Davis v. United States, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer" is insufficient to trigger Fifth Amendment right to counsel). Gregory did not clearly and unambiguously request a lawyer when he said, "I don't think I need an attorney for this." Hearing Tr. 183. The Syslos went to the police station voluntarily, were informed that they would be questioned, and agreed to answer. Under these circumstances, their Miranda waivers were not invalidated even if the officers had told them that signing the waivers was a formality. Cf. Russell v. Jones, 886 F.2d 149, 151 (8th Cir. 1989) (statement admissible despite defendant's contention that he only waived his rights and confessed because police told him "he 'had to'"). The district court did not err in concluding that the Syslos' waivers were knowing and intelligent.

To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne. United States v. Holloway, 128 F.3d 1254, 1256 (8th Cir. 1997) (waiver); United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989) (confession). A court must examine both "the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess." United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992).

Clark denied making the threatening statements attributed to him by Gregory, Hearing Tr. at 48, and the district court found that he had not, Dist. Ct. Order at 7. The credibility findings of the district court are entitled to deference. Barahona, 990 F.2d at 419. Gregory argues that his decision to confess after seeing a picture of his children in police custody could only be explained by his having been threatened. As the district court noted, however, Gregory's own testimony indicated that he himself demanded proof of his family's presence at the station so that he could gauge the likelihood that his wife could be giving the police incriminating evidence. Dist. Ct. Order at 7. Gregory testified: "[T]he reason that I needed this picture [was] to know Denell was here because you guys wouldn't prove this without a confession." Id., quoting Gregory Tr. at 6, lines 303-04.

The record does not indicate that Gregory was susceptible to police pressure or that his will was overborne. Gregory had worked as a security guard, and police had previously interrogated him in an unrelated investigation. Government Exhibit 8. Even after he agreed to confess, his statements reflected a confident attitude. Mag. Rep. at 6 ("defiant"); Hearing Tr. at 76 (testimony of Inv. Myers) ("real defiant" and "confident"). He showed familiarity with criminal procedure when he stated, "If it was not for a confession you could not have proved this. There were no fingerprints. There's no evidence left." Gregory Tr. at 6, lines 305-06. Cf. Casal, 915 F.2d at 1228-29 (suspect not coerced by knowledge that pregnant girlfriend was in custody when police had legitimate reason to take her to station and did not threaten him in

respect to her or recruit her to persuade him to confess). The district court did not err in denying Gregory's motion to suppress.

Denell argues that the district court should have suppressed her entire statement because she felt coerced when first threatened with the possibility of jail. Denell contends that she waived her Fifth Amendment privilege only after she had been placed in a police dominated atmosphere, her children had been left in a room with an unfamiliar caretaker, and Hruza had threatened jail if she were untruthful. Cf. Lynumn v. Illinois, 372 U.S. 528 (1963) (confession involuntary when police surrounded woman and threatened to cut off her state aid and put her children in foster care). The district court concluded that Denell's waiver was voluntary and that her will was not overborne at the time she made her initial statement.

This conclusion is supported by the record. Denell voluntarily took her children to the police station, Mag. Rep. at 3, and the officers obtained a caretaker for them once they were there, id. at 5. She was questioned by only a single female officer. Denell argues that she was coerced by Hruza's statement that she would not go to jail as long as she did not lie, but the transcript shows that it was Denell who introduced the issue of the children's welfare when she said, "If I didn't have my children to worry about I might lie to you thinking that I was gonna save my butt, but if Greg goes away somebody has to be there with my kids and they're my kids." Denell Tr. at 15, lines 748-50. See also Denell Tr. at 9, lines 453-459 ("And I asked [Gregory] point blank was I...gonna get a knock on the door...and he says no I didn't do it.... [And I said] I don't wanna go to jail our kids will end up with somebody we don't know, did you do this?"). This statement reveals independent and deliberate thought rather than an overborne will. Moreover, Denell testified that she knew the officers "were making efforts to contact [her] mother-in-law," Hearing Tr. at 167, and the sound of Denell's voice in her taped interview corroborates Hruza's testimony that her demeanor was controlled, id. at 109.

-11-

The dissent states that the district court found that the children were kept at the police station for the purpose of coercing Denell's confession and that this finding supports the suppression of Denell's entire confession. Neither the district court nor the magistrate judge found that the children were <u>taken</u> <u>to</u> the police station for the purpose of inducing confessions, however, and the findings of fact indicate that Denell agreed to take them along as a matter of expediency. On the record before the district court, it could have reasonably concluded that the children's presence at the station did not begin to exert any coercive influence on Denell until she realized that they would not be able to be picked up by a relative. The district court thus did not err when it suppressed only statements made by Denell after her interview resumed at approximately 1:40 p.m.

The district court examined the totality of the circumstances and concluded that Gregory's waiver was not induced by trickery or coercion, that Denell's waiver was voluntary, and that Denell's statements were voluntary until the point when they were suppressed. We find no error in these determinations. Moreover, the intentions behind the officers' actions do not control the issue of whether waiver or confession was voluntary. <u>Cf.</u> <u>Whren v. United States</u>, 517 U.S. 806, 812-13 (1996) (officer intent not determinative of whether probable cause existed); <u>Stansbury v. California</u>, 511 U.S. 318, 323-24 (1994) (per curiam) (officer intent not determinative of whether suspect was in custody); <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989) (officer intent not determinative of whether excessive force was used during seizure); <u>New York v. Quarles</u>, 467 U.S. 649, 656 n.6 (1984) (officer intent not determinative of whether public safety exception to Miranda warnings existed); <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301-02 (1980) (officer intent not determinative of whether suspect was interrogated).

After thoroughly reviewing the record, we conclude that the district court did not err in its findings or analysis. The district court conducted a thorough de novo review, made careful findings, and rejected some of the magistrate judge's recommendations. It exercised its independent judgment to exclude incriminating remarks that Denell made during the second part of her interview, including statements that she had known about the burglary immediately after it occurred and that she had known Gregory had obtained a master key to the bank before the burglary. We conclude that the statements made by Gregory and by Denell which were not suppressed by the district court were knowing, intelligent, and voluntary and that their constitutional rights were not violated.

Accordingly, the judgments of conviction are affirmed.

McMILLIAN, Circuit Judge, dissenting.

I.

I respectfully dissent. To begin, I disagree with the district court's disposition of Gregory's motion to suppress his confession.

The factual findings in the present case establish that Myers and Clark planned ahead of time to induce Gregory to come to the police station voluntarily because Myers purportedly wanted a handwriting sample for her forgery investigation. However – as the magistrate judge specifically found – it was further planned that Clark would use the opportunity to question Gregory about the bank burglary. See Mag. Rep. at 2-3 ("Clark and Myers designed a plan whereby Myers would ask Gregory Syslo to come to the LPD station to give a handwriting exemplar in connection with the forgery investigation while Clark executed a warrant to search the Syslos' residence and *he then would question Gregory in connection with the*

*burglary investigation.*") (emphasis added). While Myers may have informed Gregory that he might be questioned about the forgery matter, she never indicated that he would be interrogated about the bank burglary, as the two officers had planned all along. See id. at 3 ("In accordance with the plan, Myers called Gregory and scheduled a meeting for October 31, 2000. Because of a work-related problem, Gregory called Myers and rescheduled the meeting to 10:30 a.m. the following day. *Myers did not inform Gregory during either of these two contacts that he would also be questioned about the July 4th burglary of the NBC Bank.*") (emphasis added). If this were all that had happened, I would not disagree with the district court's disposition of Gregory's case. See Colorado v. Spring, 479 U.S. at 576 ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights."). However, after Myers read Gregory his Miranda rights, and while Gregory was looking over the waiver of rights form, Gregory "*asked Myers whether he needed an attorney for a handwriting exemplar. Myers responded 'No,' and stated that reading a person's rights in this situation was 'just a formality.'*"[5] Mag. Rep. at 4

---

[5]After quoting the very same language from the magistrate judge's report in the majority opinion, the majority points out in a footnote that Myers denied telling Gregory that he did not need an attorney and denied saying that the Miranda warning was "just a formality." See *supra* at n.3. The majority then makes the rather confusing comment that: "The fact that the magistrate judge did not allude to the officer's conflicting testimony does not necessarily mean he rejected it." Id. (citing Dist. Ct. Order at 2). The magistrate judge's factual findings speak for themselves, and, to the extent they were adopted by the district court, see Dist. Ct. Order at 1, 5, 7 (adopting the magistrate judge's report and recommendation "in all respects as it relates to Gregory Syslo"), they must be accepted as true on appeal absent clear error. We have never required a lower court to expressly reject contrary evidence in order for its factual findings to be afforded the appropriate deference under the clear error standard. Moreover, the portion of the district court's order which the majority cites in note 3, *supra*, as supporting authority ("Cf. Dist. Ct. Order at 2") comes from a part of the district court's order where the district court is making *independent* findings of fact concerning *Denell's* motion to suppress.

(emphasis added). Gregory then signed the waiver of rights form which is now being used to uphold Gregory's confession to the bank burglary.

In light of the magistrate judge's specific findings that Myers indicated to Gregory that he did not need an attorney, and that she told him the Miranda warning was "just a formality," this case is clearly distinguishable from Colorado v. Spring, 479 U.S. at 577, and McKee v. Nix, 995 F.2d at 837-38, upon which the district court and the majority rely. Indeed, in Colorado v. Spring, 479 U.S. at 576 n.8, the Supreme Court observed that, in some circumstances, "affirmative misrepresentations by the police [may be] sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege."[6] I believe this is just such a circumstance. The Miranda warning, especially in this case, was not "just a formality," and Myers knew it. The very objective of the bait-and-switch plan she had hatched with Clark was to use this opportunity to extract a confession from Gregory to the bank burglary. Yet Myers deliberately suggested that self-incrimination was not a cause for concern, on the premise that he was only there in connection with her forgery investigation. By

_____

[6]Footnote 8 of the Supreme Court's Spring opinion states in full:

In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege. See, e.g., Lynumn v. Illinois, 372 U.S. 528 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); Spano v. New York, 360 U.S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary). In this case, we are not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation and do not reach the question whether a waiver of Miranda rights would be valid in such a circumstance.

479 U.S. at 576 n.8.

saying that the Miranda warning was "just a formality," she indicated to him that invoking his right to remain silent and his right to an attorney would not make a difference, knowing full well that it would make an enormous difference because he was about to be interrogated about the bank burglary. Myers did not remain merely silent about the subject matter of the interrogation, she made affirmative misrepresentations and obtained Gregory's waiver of rights by deception.

In neither Colorado v. Spring nor McKee v. Nix did the law enforcement officers indicate to the suspect that an attorney was not needed or tell the suspect that the Miranda warning was "just a formality," or make a similar misrepresentation. In neither case did they deliberately lead the suspect to believe that the waiver of rights was for a limited purpose, and then rely upon it for a different purpose. Colorado v. Spring and McKee v. Nix stand for the related, yet materially different, proposition that, once a waiver of rights has been validly and generally executed, it may continue in effect even though the topic of the interrogation may change without warning to the suspect.

Nor is the majority's decision justified by Russell v. Jones, 886 F.2d at 151, cited in the majority opinion. In Russell v. Jones, an action brought pursuant to 28 U.S.C. § 2254, this court noted that, notwithstanding the petitioner's *claim* that the police had told him he "had to" sign a Miranda waiver and confession, "there were no findings of police misbehavior," and the record did not support a finding that the police had engaged in any improper actions. Id. In the case at bar, by contrast, the magistrate judge specifically found that Myers said "No" when Gregory asked if he needed an attorney and told Gregory that the Miranda warning was "just a formality," which – as I have explained – was clearly improper under the totality of the circumstances. Myers should have either refrained from making the affirmative misrepresentations or, at the time she introduced Clark to Gregory for purposes of

initiating Clark's interrogation regarding the bank burglary, administered a new <u>Miranda</u> warning.[7]

For the reasons stated, I would hold, upon *de novo* review, that Gregory's waiver of rights and confession, vis-a-vis the bank burglary, were not voluntary under the totality of the circumstances. Accordingly, I would remand Gregory's case to the district court with instructions to suppress his confession.

## II.

I also disagree with the district court's disposition of Denell's motion to suppress her statement. While the district court did conclude that Hruza's tactics became unduly coercive during the course of the interrogation (a finding with which I do agree), the district court did not find the circumstances to be sufficiently coercive to overcome Denell's will until well into Hruza's interrogation of Denell. I would hold that Denell's will was overborne at an earlier point in time.

In determining that Denell's statement should be suppressed starting on page 33, line 1703, of the 41-page transcript (Govt. Exh. 11), the district court reasoned as follows.

> Denell Syslo was placed in a police dominated atmosphere and expressly threatened that, unless she "told the truth," she would not be allowed to leave the station with her children. Denell was confronted by several officers in her home and was taken to the police station in a police vehicle after one officer helped her dress the children for the trip. The hearing testimony reflects that the Syslo children were upset upon arriving at the police station and had to be comforted for a period of time before they were left in the officers' lounge under the supervision

---

[7]Not only did Myers introduce Clark to Gregory and inform Gregory that Clark would be questioning him about the bank burglary, she stayed for the first five to ten minutes of the interrogation. <u>See</u> Mag. Rep. at 4-5.

of a member of the victim witness unit. The fact that Denell Syslo was aware that her three-year-old son was upset by the day's events is reflected in Exhibit 5. After her children were placed in a nearby room with a stranger, Denell was not allowed to contact a relative to come and retrieve the children. Denell was also asked to write two notes to her husband, both of which were designed to convey to him the fact that the children were being held at the police station along with her. Although there is evidence that Mrs. Syslo is educated, there is no indication that she has had any previous exposure to police interrogation. The latter pages of the transcript of Denell Syslo's statement present a dialogue between a distressed mother who wanted to leave the police station with her children and a police officer who repeatedly played upon this distress by making threats. I find that the government has failed to establish that the portion of Denell's statement beginning at page 33, line 1703, and continuing through its conclusion was not obtained through coercive tactics that overbore the will of Mrs. Syslo, and therefore that portion of the statement must be suppressed.

Dist. Ct. Order at 5 (citation omitted).

As the district court recognized, Denell was brought to the police station with her two very young children, whom she obviously could not leave at home alone. While en route to the station, Hruza informed Denell that she was not free to leave. Mag. Rep. at 3-4 ("On their way to the station Dennell asked whether she was under arrest. Hruza responded she was not under arrest, but explained that she was under investigative detention and *could not leave*.") (emphasis added). When they arrived at the police station, the children were upset and it took some time for Denell to calm them down before they could be left in a room with a volunteer caretaker. Although efforts were made to contact Denell's mother-in-law, the children were not to be removed from the police station. See Dist. Ct. Order at 5 ("In the present case, not only were express threats made to Denell Syslo concerning her children, but there is no evidence of any legitimate purpose supporting the children's detention at the police station when Denell sought to have her mother-in-law remove them prior to the interrogation."). Indeed, the district court concluded that the children were kept at

-18-

the police station for the very purpose of coercing Denell into confessing. See id. ("[I]t seems to me that the children were kept at the station in order to assist the officers in coercing a confession from Denell Syslo."); id. at 2-3 ("The notion that the children were being kept at the police station in order to assist the police in coercing a statement from Denell is supported by Investigator Hruza's testimony that, although Denell Syslo's mother-in-law was to be contacted on Denell's behalf and informed that Denell, Gregory, and the children were all at the police station, it was not a part of this arrangement to allow the mother-in-law to take the children from the station as Denell desired."). Denell was given no other option but to leave her distraught three-year-old and eleven-month-old baby in an unfamiliar place, out of her sight, with a complete stranger.

Under these circumstances, Hruza proceeded to take Denell into a separate interview room, where she began questioning Denell, "repeatedly play[ing] upon [Denell's] distress by making threats." Id. at 5. Hruza's "threats" (as the district court described them) presented Denell with a Hobson's choice: incriminate yourself and go home with your children *or* refuse to incriminate yourself and immediately go to jail, leaving them to suffer the consequences. The loud and clear message continued to be that confessing was the only way for Denell to ensure a reunion with her children.

The following was the first *tape recorded*[8] threat made by Hruza:

DENELL SYSLO: I had my doubt I mean I didn't know for sure he [Gregory] didn't tell me flat out but you know I didn't lie to you I had my doubts but he never came flat out and told me. He just, he danced around it like I told you well what if I did ah you know I'm not gonna lie to you I doubted.

_____

[8]Hruza admitted that, although she obtained the tape recorder before the interview began, she did not start the tape recorder right away. Hearing Tr. at 113, lines 7-12.

INV. HRUZA: Okay

DENELL SYSLO: I wondered

INV. HRUZA: **Well as long as you don't lie you're not going to jail. If you lie they might decide that there's reason to take you to jail that you would not stick around or something**.

DENELL SYSLO: If I didn't have my children to worry about I might lie to you thinking that I was gonna save my butt but if Greg goes away somebody has to be there with my kids and they're my kids.

INV. HRUZA: **I guess you know you'd prefer to have you there**.

Transcript (Govt. Exh. 11) at page 14, line 735, through page 15, line 752 (emphasis added).

As the interview proceeded, Hruza became increasingly forthright in making her threats, as the following examples illustrate. "[Y]ou know right now you're sitting on the line whether you go to jail or you walk out of here with your kids?" Id. at 33, lines 1704-05. "You know I don't wanna take you away from your kids and put you in jail okay but I need you to be truthful and not hold back from me anymore." Id. at 34, lines 1797-99. "[Y]ou tell the truth I'm not gonna take you to jail. You may get a ticket, you are probably going to get a ticket, okay but I won't take you to jail. If you lie to me and keep lying to me you are most likely going to go to jail." Id. at 36, lines 1880-83. Finally, "You can go over there and sit in the jail with him or you can go home with your kids." Id. at 37, lines 1946-47.

In my opinion, there is no material difference between Hruza's statement found on page 14 of the transcript (Govt. Exh. 11), and the later statements beginning on page 33. The mere fact that Hruza did not herself expressly mention the children in the earlier statement is inconsequential because Hruza was explicitly threatening Denell with immediate detention in jail. Hruza of course knew that Denell was

thinking about the effect her detention would have on the children, and Hruza was obviously insinuating that Denell would not be there to take care of them.[9] I believe it was clear error for the district court not to find that Hruza was implicitly threatening Denell and was, by that point in time, overbearing Denell's will and critically impairing her capacity for self-determination. See United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) ("In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express *or implied*), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired. In making this determination, courts look at the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist pressure.") (emphasis added) (citations omitted).

Finally, in an effort to justify Hruza's repeated threats, the government argues that they were not coercive because they were mere expressions of what Hruza genuinely believed to be true.[10] However, testimony from the suppression hearing belies that assertion. Detective Myers testified that *she* was the one who obtained approval from the county attorney for Denell's release, and the issue of Denell's truthfulness never came up in her conversation with the county attorney about whether or not Denell should be released. By contrast, the problem of having to place the children in foster care if Denell were held in jail did come up as a reason in favor of releasing her, without any mention of Denell's truthfulness or any other

---

[9]Indeed, although we cannot know exactly what transpired between Hruza and Denell beforehand, because Hruza did not tape record the beginning of the interrogation, see *supra* note 8, the dialogue suggests to me that they had previously discussed the uncertain fate of the children.

[10]The government argues: "Officer Hruza understood that if Denell Syslo provided *false* information to the police this might be a factor taken into consideration in determining whether Denell could at that time be released or logged in jail, and she so informed Denell." Brief for Appellee at 13 (emphasis in original).

condition.[11]  This evidence demonstrates that there was no factual basis for Hruza's repeated threats to Denell.  Nevertheless, from the time Hruza told Denell that she was not free to leave until the time Denell was finally released with her children about two and a half hours later, the officers continued to convey to Denell, through their actions and their words, that she had to confess if she wanted to go home with her children.  Indeed, as the district court concluded, the very purpose of detaining the children at the police station for the duration of Denell's interrogation, rather than allowing them to be picked up by their grandmother, was "to assist the officers in coercing a confession from Denell Syslo."  Dist. Ct. Order at 5.

I would hold, upon *de novo* review, that most, if not all, of Denell's tape-recorded statement was the product of an overborne will and, therefore, was not provided voluntarily under the totality of the circumstances.  I would reverse the district court's denial of her motion to suppress as to the first 32 pages of the 41-page transcript (Govt. Exh. 11), and I would remand Denell's case to the district court with

---

[11]Upon questioning by the magistrate judge at the suppression hearing, Myers testified as follows:

> THE COURT: Did [the county attorney] ever condition the decision to release Denell Syslo on her satisfying you that she was telling the truth?

> [MYERS]: I don't think I ever even brought that up.  I told him that – or I asked him, I said, do you have a problem if we cite and release Denell for a felony and have her show up for arraignment tomorrow since she's got her kids down here?  Then we don't have to find a place for them.  And he said, no, I don't have a problem with it if you're comfortable with it.  I don't think we ever went into any conditions or anything like that.

> [MYERS]: And this is something that we – we have done with the county attorney in the past.  We've cited and released on felonies before.

Hearing Tr. at 140, line 12, to 141, line 4.

instructions to suppress the statement starting at least at page 14, line 744, of the transcript.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT