**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Juwan A. STURDIVANT, Defendant–
Appellant.**

No. 15–1059.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 2015.

Decided Aug. 4, 2015.

Katherine Virginia Boyle, Attorney, Office of the United States Attorney, Urbana, IL, K. Tate Chambers, Greggory R. Walters, Attorneys, Office of the United States Attorney, Peoria, IL, for Plaintiff–Appellee.

Robert A. Alvarado, Thomas W. Patton, Attorneys, Office of the Federal Public Defender, Peoria, IL, for Defendant–Appellant.

Before BAUER, ROVNER, and HAMILTON, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant, Juwan A. Sturdivant, pleaded guilty to four counts of interfering with commerce by robbery, 18 U.S.C. § 1951, and one count of using and carrying a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c). Sturdivant appeals the district court's denial of his motion to suppress, having reserved the right to do so in his plea agreement. Sturdivant moved to suppress post-arrest inculpatory statements that he made to law enforcement, claiming that the statements were the involuntary result of coercive police tactics and his weakened physical condition as an insulin-dependent diabetic. We affirm.

## I. BACKGROUND

Over a two week period in April 2012, two men committed four armed robberies of various businesses located in Peoria, Illinois. At the fourth and final robbery, the two robbers left a plastic bag at the scene of the crime. Law enforcement recovered the bag and sent it to the Illinois State Bureau of Forensic Science for processing. On April 27, 2012, the Peoria Police Department was notified that a latent fingerprint impression lifted from the bag matched to Sturdivant. Later that day, Sturdivant was arrested and taken to the Peoria Police Department for questioning. On April 28, 2012, Sturdivant made a video recorded statement admitting to his involvement in the four armed robberies.

On June 20, 2012, a grand jury returned an indictment charging Sturdivant with four counts of armed robbery and four counts of using a firearm in connection with a crime of violence. Sturdivant pleaded not guilty and filed a motion to suppress, challenging the voluntariness of his post-arrest confession. The district court conducted an evidentiary hearing on Sturdivant's motion on April 23, 2014.

At the suppression hearing, five police officers and Sturdivant's mother testified. The following evidence was presented through their testimony: On April 27, 2012, Detective Timothy Moore obtained a no-knock search warrant to search Sturdivant's residence in connection with the string of robberies. Before the warrant could be executed, officers stationed outside the target residence observed Sturdivant and another individual (later identified to be Sturdivant's juvenile accomplice, who we will refer to as JW) leaving the home. When officers approached the two suspects, Sturdivant fled. After a brief footrace, Sturdivant was apprehended and placed under arrest. He and JW were then taken to the Peoria Police Department and placed in separate interview rooms.

Sergeant Ruth Sandoval and Detective Keith McDaniel interviewed Sturdivant. The interview began at approximately 7:15 p.m. on April 27. Sandoval collected various background information, including Sturdivant's age (18 years old), where he lived, and his education level (he dropped out of high school in the 11th grade, but was then attending alternative school). Sturdivant informed the officers that he was an insulin-dependant diabetic and that he was feeling "real tired." Sandoval then advised Sturdivant of his *Miranda* warnings and asked if he would be willing to speak with her and Detective McDaniel. Sturdivant agreed to talk. During this interview, which lasted approximately 45 minutes, the officers confronted Sturdivant with various details from the four armed robberies, including the fact that his fingerprint matched to a fingerprint impression lifted from a bag that the robbers left behind at the fourth robbery. Sandoval also told Sturdivant that officers had recovered DNA evidence from the bag, even though she knew no such DNA evidence existed. Throughout the interview, Sturdivant repeatedly denied any involvement in the robberies.

Around 45 minutes into questioning, Sturdivant said that he was not feeling well and needed his insulin. The officers, in response, broke from questioning and told him that his insulin was available; it had been brought to the station by Detective Robert McMillion, who obtained the insulin from Sturdivant's home while executing the search warrant. Sandoval then asked Sturdivant if he thought he needed his insulin and he said no. Sandoval offered to get him a medic because protocol would not permit the officers to let Sturdivant inject himself, but Sturdivant declined; instead he asked to smoke

a cigarette. Per Sturdivant's request, the officers moved him into another room and allowed him to smoke a cigarette; also per his request, the officers gave him a glass of water. At this time, Sturdivant was also provided with a meal from Steak 'n Shake.

After the break, which lasted about an hour to an hour and a half, Sandoval and McDaniel resumed questioning for about 20 to 30 minutes. During this interview, Sturdivant responded to a few of the officers' questions by referring to himself in the third person. For example, when again confronted with the fingerprint evidence from the fourth robbery, Sturdivant responded, "Ya'all didn't get Juwan's fingerprint." Because Sturdivant continued to deny his involvement in the robberies, and since the officers had exhausted their line of questioning, the officers decided to stop for the evening.

Both Sandoval and McDaniel testified that they were familiar with the symptoms exhibited by a diabetic with low blood sugar, including profuse sweating, lethargy, slurred speech, flushed coloring, and a confused state. They both testified that Sturdivant exhibited none of these symptoms on April 27, aside from him saying he was "real tired." He did not outwardly appear ill or fatigued, he exhibited no problems with his memory, and he was able to carry on a conversation with the officers.

The following day, April 28, Sandoval had Sturdivant transported back to the Peoria Police Department at approximately 2:30 p.m. for further questioning. Detective Moore was present with Sandoval at the time. Sandoval again advised Sturdivant of the *Miranda* warnings prior to asking him any questions. The first question Sandoval asked Sturdivant was how he spent the evening. Sturdivant replied, "not good." Sandoval then asked him if he felt bad for scaring people during the robberies, and Sturdivant nodded his head

affirmatively. He then told Sandoval and Moore about his involvement in each of the four armed robberies. At some point during the interview, Sturdivant asked if he could see his mother, Aneyshia Thomas. According to Moore, Sandoval told Sturdivant, "we need to get down to the bottom of these robberies before ... we do anything like that." Sandoval twice denied that she agreed or even offered to let Sturdivant see his mother in return for his cooperation. Moore also testified that Sandoval made no offer or promise to Sturdivant about seeing his mom. During the interview, Sturdivant did not tell the officers or otherwise indicate that he was suffering from the effects of diabetes. Neither Sandoval nor Moore observed any signs that Sturdivant was suffering from such effects; he was not sweating, did not appear confused, was able to articulate and recount the details of the robberies, and he never asked for medical help or insulin.

After Sturdivant confessed to his involvement in the armed robberies, he agreed to take the officers to the location where he discarded the firearm that he discharged in each of the four robberies. Sturdivant left the police department in a car with Sandoval, Moore, and Detective Erin Barisch at approximately 3:55 p.m. All three officers testified that Sturdivant did not exhibit any signs that he was suffering from diabetes during the trip to find the gun. Barisch testified that Sturdivant gave directions in a "very clear, very concise, [and] very matter of fact" manner. The police searched the area that Sturdivant directed them to and found the discarded firearm. Sturdivant then asked if he could see his mother and the officers drove him to his home and allowed his mother, Thomas, to sit with him for about 20 minutes in the backseat of the officers' car. Sandoval testified that "[i]t wasn't determined to go see his mother or decided until the handgun was recovered within

a block, a block or two radius of his home, and I think that's when we decided to take him to his mom's." As she put it on cross-examination: "We were dealing with an 18–year–old man. He was cooperative. We had some compassion. His mom was very cooperative during the search warrant, almost sorrowful that her son had been involved in the things, so we took him."

Thomas testified that she received a phone call from Sandoval, during which "[Sandoval] said that ... [Sturdivant] asked them [the officers] if he would be able to see his mom, and she said that if he will cooperate then they would bring him by the house to see me, and she said that he had cooperated so they keep their promises, so she was going to bring him by to see me." She testified that Sturdivant was allowed to sit in the backseat of the officers' car with her for about 20 minutes. At that time, she said "[Sturdivant] looked like he was stressed. He looked like he didn't feel well, like he hadn't had any sleep. His eyes were kind of red. He just didn't appear well." When Thomas stepped out of the car to leave, Sturdivant told her he felt like he was going to throw up. He then proceeded to vomit. Sandoval, who stood outside the car as Thomas visited with her son, testified that she could not tell "if [Sturdivant] vomited or [was] spitting but he was quite upset seeing his mom."

Thomas, who worked as a surgical tech for 15 years, further testified to her son's diabetic condition. When his blood glucose levels were very high, she said that Sturdivant sometimes acted grouchy, sleepy, or just not himself. She testified that vomiting indicated that Sturdivant's blood sugar level was "[v]ery, very low." In addition, when his blood sugar was low, Sturdivant would act confused and exhibit flu-like symptoms and nausea. Thomas, who testified that she could always tell if

Sturdivant's diabetes was under control, did not tell Sandoval or any other officer that Sturdivant was ill or suffering from diabetes.

Sturdivant was taken back to the police department, arriving at approximately 4:45 p.m. Sandoval had a meal from Steak 'n Shake ordered for Sturdivant and asked him if he would be willing to discuss on video "everything that [they] had already discussed up to that point...." Sturdivant said he would. The interview began at approximately 6:20 p.m. and ended just before 7:00 p.m. Sandoval informed Sturdivant that the interview was being video and audio recorded and read him the *Miranda* warnings from a form as Sturdivant read along. Sturdivant said he understood his rights and agreed to speak with the officers. He also signed a written *Miranda* waiver and a consent form to allow videotaping of the interrogation.

Once the recording had begun, McDaniel confirmed that Sturdivant was an insulin-dependent diabetic and asked how he was feeling. Sturdivant answered, "I'm feeling alright." McDaniel asked Sturdivant if he was in the "right frame of mind" and if he understood what was going on, and Sturdivant nodded in affirmation and answered, "Yes, sir." Sturdivant also stated that he had been allowed to use the bathroom, drink water, and eat prior to the interview. Over the next 25 minutes, Sturdivant answered the officers' questions and made a full confession to all four armed robberies.

Sturdivant's recorded statement was admitted into evidence at the suppression hearing. Also admitted into evidence was a discharge summary from the Methodist Medical Center of Illinois, in Peoria, Illinois. The discharge summary showed that Sturdivant was admitted to the hospital on May 1, 2012, with nausea, vomiting, stomach pains, and difficulty

breathing. He was found to have diabetic ketoacidosis, which develops when the body is unable to produce enough insulin. Sturdivant told the medical staff that his symptoms began about seven days prior to his admission and that he had been "vomiting all week, not keeping anything down." His medical charts revealed that at the time of admission he was: "Able to ambulate without difficulty. Oriented X3 (Person, Place, Day). Cooperative. Fully verbal." His speech was normal, and his breathing sounded clear and was "regular and unlabored." Sturdivant was discharged from the hospital on May 2, 2012.

At the conclusion of the suppression hearing, the district court orally denied Sturdivant's motion. The district court viewed Sturdivant's video recorded statement, finding that Sturdivant appeared to have "his faculties about him," he "sat upright" and "[h]e seemed to understand the questions and he was able to articulate the answers." The court further found that Sturdivant did not appear "in any way to be physically ill" or "to be in a mental state that was any kind of weakened condition either." The court considered Sturdivant's age and level of education, finding that neither of these factors supported a "finding that he was coerced or somehow misled in th[e] interrogation." With respect to Sturdivant's diabetes, the court found that Sturdivant did not appear to display the effects that one would expect to see from a person "suffering from the ill effects of insulin."

## II. DISCUSSION

■ Sturdivant argues that he gave his post-arrest confessions involuntarily and that the district court erred in rejecting his motion to suppress. We review *de novo* the district court's determination that Sturdivant's confessions were voluntary, *United States v. Montgomery,* 555 F.3d 623, 629 (7th Cir.2009), and we review the

district court's relevant factual findings for clear error, giving "special deference to the district court's credibility determinations," *United States v. Villalpando,* 588 F.3d 1124, 1127 (7th Cir.2009). The government bears the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

■ We have held that "a confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum,* 372 F.3d 848, 856 (7th Cir.2004) (internal quotations and citation omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "[W]e analyze coercion from the perspective of a reasonable person in the position of the suspect," *United States v. Huerta,* 239 F.3d 865, 871 (7th Cir.2001), and consider the following factors: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.* Sturdivant claims that a number of factors combined to render his confessions the involuntary product of police coercion. We discuss each in turn.

■ Sturdivant asserts that the "most significant" factor demonstrating that his confessions were coerced was the "relative indifference" that the officers displayed to his diabetes and the "obvious physical dis-

tress it caused." The record reveals that on April 27, Sturdivant told officers he was "real tired," asked officers for his insulin, and responded to some of the officers' questions in the third person; on April 28, he vomited after speaking with his mother. Sturdivant argues that these facts show that he was suffering from the effects of diabetes and, therefore, confused to the point that his confessions were rendered involuntary.

As an initial matter, we note that Sturdivant did not make any incriminating statements on April 27. Instead, he repeatedly denied his involvement in the robberies that night. Accordingly, it is hard to see how the symptoms he claims to have experienced on April 27—his tired condition and the use of the third person—demonstrate that he was confused to the point that his confessions, which occurred the following day, were involuntary. Furthermore, when Sturdivant asked for his insulin on April 27, the officers broke from questioning and offered him his insulin along with the assistance of a medic. Sturdivant declined, instead opting to smoke a cigarette. Simply stated, the officers were anything but indifferent to his condition on April 27. Thus, we turn to April 28—the date of his confession.

Two interview sessions occurred on April 28. During the first session, Sturdivant made an unrecorded oral confession to his involvement in the robberies; during the second session, he made a video recorded confession to the same. Between these two interview sessions, Sturdivant vomited while speaking to his mother. This fact, he asserts, demonstrates that he was suffering from the effects of diabetes when he made his confessions. In support of his claim, he points out that his mother, Thomas, testified that vomiting generally indicated that Sturdivant's blood sugar was "[v]ery, very low." Although Thomas testified that she would "always know" if

her son's diabetes was under control, she never expressed any concern, or otherwise told officers, that Sturdivant was ill, that he needed sugar or insulin, or that he was suffering from the effects of diabetes; nor did she testify that her son was indeed suffering from the ill effects of diabetes at the time he vomited. At any rate, even if Sturdivant's diabetes caused him to vomit, the record does not support the conclusion that Sturdivant's confessions were the involuntary product of coercion. With respect to his initial confession, which occurred before he vomited, Sturdivant did not tell the officers that he was suffering from the effects of diabetes or ask for his insulin (as he had during the April 27 interview), and neither of the interviewing officers, Sandoval and Moore, saw any signs that Sturdivant was suffering from the effects of diabetes—he was not sweating, did not appear confused, and was able to articulate and recount the details of the robberies. As for his second confession, Sturdivant confirmed on video that he was in the right frame of mind, was "feeling alright," and that he understood what was going on. Furthermore, after viewing the video recorded confession, we agree with the district court's findings that Sturdivant was attentive; he seemed to understand all of the officers' questions and was able to articulate clear answers, he did not appear to be ill, and he did not appear to be suffering from any sort of weakened mental condition. Also evidencing that Sturdivant had his mental faculties about him when he gave his second confession is the fact that, shortly before he vomited and merely hours before the second confession occurred, he was able to direct officers in a very clear, very concise, and very matter of fact manner to the gun he discarded the prior day. In sum, there is no basis to conclude that Sturdivant's diabetes led to an involuntary confession. Every witness who addressed the issue testified that

Sturdivant appeared to understand what was going on and did not act or appear to be confused or lethargic or exhibit any other signs that he was suffering from the effects of diabetes. And, as already noted, the video recorded confession corroborated this testimony. For these reasons, the district court did not err in determining that Sturdivant's confessions were not rendered involuntary on account of his diabetes.

■ Sturdivant next argues that he was coerced by Sandoval's false representations that officers had recovered Sturdivant's DNA from the crime scene. This argument is also unpersuasive. "[W]e have repeatedly held that a law-enforcement agent may actively mislead a defendant in order to obtain a confession, so long as a rational decision remains possible." *Conner v. McBride,* 375 F.3d 643, 653 (7th Cir.2004) (internal quotations and citations omitted). We have also held that "a lie that relates to the suspect's connection to the crime is the least likely to render a confession involuntary." *United States v. Ceballos,* 302 F.3d 679, 695 (7th Cir.2002) (citation omitted). Sandoval's statement, although false, did not override Sturdivant's free will and coerce him into confessing. In fact, when confronted with the false DNA evidence, Sturdivant denied his involvement in the robberies, and he continued to deny his involvement for the remainder of the interviews that occurred on April 27, when the false statement was made.

■ Sturdivant also argues that the officers' method of advising him of his *Miranda* warnings was coercive. Notably, Sturdivant does not claim that the officers failed to advise him of the *Miranda* warnings before any of the interviews, nor does he claim that he did not understand his rights or that his waivers were not knowingly and voluntarily made. Rather, he takes issue with the fact that Sandoval

gave him his *Miranda* warnings orally during the unrecorded interviews, using a written *Miranda* waiver only after he confessed. Sturdivant does not direct our attention to any case law, from this court or any other court, in support of his position. At any rate, the absence of a written *Miranda* waiver did not render Sturdivant's oral waivers or subsequent confessions involuntary products of coercion. *See United States v. Murdock,* 491 F.3d 694, 700 (7th Cir.2007) (holding officers' failure to obtain a written waiver from defendant did not render his oral waiver or subsequent confession involuntary).

Sturdivant next claims that Sandoval promised him that he could see his mother in exchange for his cooperation and that this promise coerced him into confessing. The government disagrees with Sturdivant's contention that Sandoval made such a promise. The record reflects that both Sandoval and Moore testified there were no offers or promises made to Sturdivant about seeing his mother. According to Moore, when Sturdivant broached the subject, Sandoval told him "we need to get down to the bottom of these robberies before ... we do anything like that." Thomas, however, testified that she received a call from Sandoval, during which:

She [ (Sandoval) ] said that she was going to bring Juwan back to the house to see me because they had a discussion about whether or not he would cooperate and he told them—he asked them if he would be able to see his mom, and she said that if he will cooperate then they would bring him by the house to see me, and she said that he had cooperated so they keep their promises, so she was going to bring him by to see me.

■ The district court did not make any factual findings on whether or not a promise was made. However, we do not believe remand is necessary because, even accept-

ing Thomas' version as true, Sandoval's purported promise did not override Sturdivant's free will and coerce him into confessing. After having received and waived his *Miranda* warnings for the second time in as many days, it was Sturdivant who broached the subject of seeing his mother. Sturdivant had no right to see his mother, but Sandoval allegedly made a gratuitous promise to take him by his mother's house if he cooperated. Sandoval did not harp on the subject or hang it over Sturdivant's head, she merely responded to Sturdivant's request and that ended the matter. Plainly stated, Sandoval's purported promise was not so powerful or overwhelming such that it prevented Sturdivant from exercising his rational intellect. Furthermore, Sandoval's purported promise was not an empty promise; it did not falsely skew the calculus on which Sturdivant made his decision to cooperate. *See Villalpando*, 588 F.3d at 1128 (explaining that "[a]n empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose" (citation omitted)). All in all, assuming that Sandoval promised to take Sturdivant to see his mother in exchange for his cooperation, this promise did not override Sturdivant's rational intellect and free will so as to make his confessions involuntary.

 Finally, Sturdivant contends that his age, education level, and lack of experience with police interrogations, when considered in combination with the aforementioned factors, render his inculpatory statements the product of coercion. Sturdivant was 18 years old and, although he dropped out of high school in the 11th grade, he was attending alternative school at the time of his arrest. As for his prior experience with law enforcement, Sturdivant is correct that the record does not show he had ever before experienced a custodial interrogation; but this was not

his first encounter with the criminal justice system—he was a felon at the time of his arrest. The district court found that there was nothing about Sturdivant's age or education that supported the conclusion that his confessions were coerced. Given the standard of review to which we must adhere, and the manner in which Sturdivant conducted himself on video, we see no reason to upset the district court's finding on this point.

## III. CONCLUSION

For the aforementioned reasons, the district court's denial of Sturdivant's motion to suppress is AFFIRMED.