In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1198

JEANETTE M. JANUSIAK,

*Petitioner-Appellant,*

*v.*

SARAH COOPER,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 17-CV-514 — **William C. Griesbach**, *Chief Judge.*

ARGUED JULY 9, 2019 — DECIDED AUGUST 22, 2019

Before KANNE, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* After an infant died in the care of petitioner Jeanette Janusiak, a Wisconsin jury found her guilty of first-degree intentional homicide. On direct appeal, state courts rejected her argument that statements she made during an interrogation were involuntary and should have been suppressed. Janusiak then asserted that argument in federal court in her petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied relief. We affirm.

On appeal, Janusiak contends her statements were coerced by (1) comments that law enforcement made to her about keeping access to her children, (2) the length and other features of the interrogation, and (3) her vulnerability as a pregnant woman and mother. We affirm because the state appellate court reasonably applied the correct standard to determine that Janusiak's statements were voluntary.

I. *Factual and Procedural Background*

The facts about Janusiak's case are drawn from the state-court record. Janusiak called 911 to report that Payten Shearer, a friend's baby in her care, was not breathing. Paramedics took Payten to the hospital while officers talked to Janusiak. The police returned about eight hours later, and Janusiak, then eight months pregnant, agreed to go to the police station for an interview. Police questioned her about Payten's death for about seven hours. Toward the end of the interrogation, Janusiak made statements about what happened to Payten that were used to impeach her testimony at trial. The Wisconsin Court of Appeals court described the interrogation as follows:

> It is undisputed that, during the interview with the officers that she now challenges, Janusiak initially repeated the same account that she had given to police after they responded to a 9-1-1 call made by Janusiak. This initial account was that, after she had put the baby on a bed in a bedroom, Janusiak fell asleep in the living room, was awakened by a "choking, gurgley noise," and when she went into the bedroom she found that the baby was not breathing and she called 9-1-1. Janusiak said that she was not

aware of any problem with the baby before she was awakened by the sounds.

However, as the interview that Janusiak now challenges progressed, Janusiak's account changed markedly from the initial claim that she had no knowledge of how the baby had been injured. Janusiak at one point said, "She [the baby] fell off my bed, it was off my bed." Later, Janusiak said, "She hit the table." Later, Janusiak said, "She went down, she hit the table, there's a little shelf opening in the table and she hit that. And then she fell and then she (unintelligible). And then I grabbed her." Later still, Janusiak said, "I set her down on the bed, she fell off the bed…. It was the table. She hit, she hit the table." Throughout the remainder of the interview, Janusiak remained insistent that this last account was accurate, rejecting the police officers' position that the baby's injuries could not have occurred in the manner that Janusiak described, given the medical evidence as the officers understood it.

*State v. Janusiak*, 876 N.W.2d 178, 367 Wis. 2d 349, ¶¶ 3–6 (Wis. App. 2016) (footnote omitted).

Janusiak was charged with first-degree intentional homicide. Before trial, she moved to suppress a video recording of the interrogation. The trial court denied the motion, and the recording was shown to the jury to undermine her credibility with her inconsistent story.

The state appellate court described the testimony received at the suppression hearing and the trial court's ruling on Janusiak's motion:

> At the hearing on voluntariness, Janusiak did not testify. The officers who conducted the interview testified to facts that included the following. Janusiak was cooperative and willing to go to the police station for the interview. Janusiak was not in handcuffs either prior to entering the interview room or during the interview. The entire interview was recorded. Janusiak was read, understood, and waived her *Miranda* rights. The officers provided Janusiak with soda and with "at least three" breaks during the interview, which Janusiak used to smoke or to use the restroom. Janusiak appeared to understand the interview questions and did not appear to be tired.
>
> Based on this testimony and a viewing of the recording of the interview, the circuit court determined that the statements were made voluntarily. The court noted that the interview session was lengthy (approximately seven hours including breaks), but found that Janusiak "did not appear to be over tired or unable to exercise her free will during the interview." The court found that there were "at least a couple" breaks in the questioning and that the officers offered Janusiak food and drink during the interview. Addressing Janusiak's arguments that the officers coerced her statements by promising her

> that she would return home to her children and would not go to jail if she cooperated, the court found that "the officers were confrontational about her explanation for the victim's injuries which they believe did not match what they were being provided by medical professionals." However, the court also found that nothing that the officers did or said "rose to the level of coercive police conduct." The court ultimately concluded that the statements "were voluntary under the totality of the circumstances," because police did not use "improper … practices or coercion" "to obtain the statements."

*Janusiak*, 367 Wis. 2d 349, ¶¶ 3–6 (footnote omitted). We have viewed and compared the video with the transcript. The state appellate court's description and the transcript are materially consistent with the video.

Besides using Janusiak's inconsistencies from the interrogation to undermine her credibility, the State relied heavily on testimony from medical experts that implicated Janusiak. A radiologist testified that Payten's skull was fractured in three places and that a fall from a bed would be unlikely to cause those injuries. A pediatrician specializing in child abuse testified that Payten had bruising on her chest and back in a pattern resembling an adult hand, and that these injuries, among others (such as detached retinas), had occurred shortly before the paramedics started treating Payten. The pediatrician also concluded that Payten had been sodomized with an object and had suffered "definite abusive head trauma, child physical abuse that led to [her] demise." The experts relied on the facts that Janusiak was Payten's primary caregiver for the

three days preceding Payten's injuries and was, according to Janusiak herself, the only adult in the home the night that she called 911. The State also introduced evidence that Payten's blood was found on a wall of the bedroom, on the bed, and on a washcloth stuffed under the mattress.

Janusiak's defense focused on testimony from her and her medical expert. She insisted that she never hit or sodomized Payten and that Payten had not fallen off a bed. She said that she changed her story during the interrogation only because the officers "scared me, and they told me, basically the truth wasn't enough, so if I knew what happened to Payten, and an accident happened, then I can go home to my children." She described her physical condition during the interrogation as "very far along in pregnancy and physically exhausted." Her medical expert testified that the iron content of Payten's blood, the "healing characteristics" of Payten's head, and de-lay between injury and symptoms in some infants suggested that Payten's injuries were inflicted "a few days prior to Pay-ten's collapse."

The jury found Janusiak guilty of first-degree intentional homicide, and she was sentenced to life in prison. In her direct appeal in state court, she argued that her statements during the interrogation were coerced in violation of the Fifth and Fourteenth Amendments. She gave three reasons: First, the of-ficers and a social worker threatened to separate her from her children if she did not satisfy them, a tactic that she said was barred by *Lynumn v. Illinois*, 372 U.S. 528 (1963). *Lynumn* over-turned a conviction for unlawful marijuana use that was based in part on a confession that the police obtained by threatening Lynumn that unless she "cooperated," they would take her children from her and stop the state's financial

aid to the children. Second, the threats, the length of the interrogation, her pregnancy, and the officers' promises to let her see her children if she cooperated, combined to create an unduly coercive atmosphere for any defendant. Third, she was particularly vulnerable to coercion because of her pregnancy and status as a mother of four young children.

The appellate court affirmed for several reasons. It first determined Janusiak was not "particularly vulnerable to police pressures and tactics." *Janusiak*, 367 Wis. 2d 349, ¶ 15. The court cited her age of 24, high-school education, five prior experiences with the police, calm demeanor ("she had ceased crying and was calm by the time the officers began to question her"), absence of exhaustion, and officers' repeated offers of breaks, food, and drink. ¶¶ 9, 13, 15. The court noted that "[a]dvanced pregnancy might be a contributing factor if combined with other pertinent facts … , but Janusiak fails to point to any such pertinent facts." ¶ 15.

In addition, the circumstances of the interrogation were not unduly coercive. First, Janusiak had "clearly and voluntarily waived" the rights established in *Miranda v. Arizona*, 384 U.S. 436 (1966), for her "lengthy" custodial questioning. 367 Wis. 2d 349, ¶ 17. Second, the officers did not threaten or use violence or intimidation. *Id*. Third, the officers "were generally attentive to Janusiak's personal needs and did not appear to take advantage of her emotional state when she cried in their presence." *Id*. Fourth, Janusiak did not ask to stop the interview and even asked "to continue talking when the officers said it was time to end the interview." *Id*., ¶ 19. The court explained that those facts, plus its review of the interrogation video, did not make this one of the "rare" cases where the

police gave *Miranda* warnings but the suspect's statements should still be deemed to have been coerced. ¶ 18.

Next, the court addressed Janusiak's argument that, in violation of the principle of *Lynumn,* she was "threatened" with losing her children unless she acknowledged her guilt. *Janusiak,* 367 Wis. 2d 349. ¶ 21. The court focused first on the statements of the social worker, Hazel Coppernoll:

> Coppernoll was present during the questioning for fewer than ten minutes of the seven-hour interview period. Coppernoll informed Janusiak that she was "not taking [Janusiak's children] into custody," but that Coppernoll was concerned for Janusiak's children if it turned out that the baby had been injured in Janusiak's home. Coppernoll also suggested, before leaving the interview room, that Janusiak "be as cooperative as [Janusiak] possibly can." … [T]hat statement came nearly six minutes after Coppernoll informed Janusiak that she was not taking her children into custody. Moreover, it came on the heels of Coppernoll telling Janusiak, in a seemingly non-threatening vein, "hopefully I won't be back in touch with you[,] we[']re going down to the hospital right now, …."

¶¶ 22, 24.

The court rejected the argument that Coppernoll encouraged Janusiak to acknowledge guilt. If anything, the court said, Coppernoll's statements "most likely" "had the effect of causing Janusiak to continue to deny that the baby was injured in any manner at her home, whether accidental or

otherwise." *Janusiak*, 367 Wis. 2d 349, ¶ 23. *Lynumn* was "inapposite," the court added, because there the police "threatened the defendant with the loss of her children if she did not confess to possession and sale of marijuana." ¶ 25. Coppernoll simply "conveyed the idea that *if* the baby had been injured in Janusiak's home, social services might take her children away." *Id*. (emphasis added).

Finally, the court rejected Janusiak's argument that the police had, inconsistently with *Lynumn*, "promised" that she could go home to her children if she cooperated. 367 Wis. 2d 349, ¶¶ 26–31. The court highlighted these exchanges that Janusiak cited:

> Police Chief [Timothy] Becker: We don't want you to go to jail, we want to find out what happened.
>
> Janusiak: I don't want to go to jail.
>
> Becker: We want to find out.
>
> Detective [Andrew] Stelter: I want to send you home with your kids, that's what I want.
>
> Becker: But you're not giving us anything to work with here.
>
> Janusiak: There is nothing else I can think of that (unintelligible) happened to her though…. I'm trying to tell you, (unintelligible).
>
> Stelter: There, there's got to be something, there got to be some
>
> …

> Becker: I feel, I feel terrible for you, but you're kind of, this is the way you want this to go down and that's, that's totally up to you, I understand, if you have [a] reason that you want to go to jail I guess that's, that's fine.

> Janusiak: (unintelligible)

> Becker: But we're talking about jail, no kids[.]

> Janusiak: I'll show you how I picked [the baby] up.

> Becker: No family. It doesn't matter how you picked her up.

367 Wis. 2d 349, ¶ 28.

These passages, the court explained, suggested only that the officers would allow Janusiak to leave if she gave them an "*exculpatory* explanation" that matched their understanding of the medical evidence. ¶¶ 27, 29 (emphasis in original). Janusiak's story did not do that because doctors said that a fall from the bed—her then-current story—could not explain Payten's injuries. ¶ 27. Statements about the potential benefits of exculpating oneself, the court said, are not unduly coercive.

Under the totality of the circumstances, the court ruled, Janusiak's statements were voluntary. 367 Wis. 2d 349, ¶¶ 10, 30–31. The Supreme Court of Wisconsin denied further review. *State v. Janusiak*, 371 Wis. 2d 606 (Wis. 2016).

Janusiak then filed her § 2254 petition in federal court. She asserted that the state appellate court's decision rejecting her claim of coercion was contrary to or involved unreasonable applications of (1) *Lynumn*; (2) *Miranda*; and (3) Supreme Court cases on the "totality of the circumstances." She added

that the state courts unreasonably found that the officers (1) waited for her "to stop crying and calm down before questioning her" and (2) told her that she could go home if she had an "exculpatory explanation" that did not contradict the medical evidence. The district court denied relief, ruling that the state appellate court's application of federal law and fact-finding were not unreasonable. The district court then issued a certificate of appealability under 28 U.S.C. § 2253(c).

II. *Analysis*

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court cannot issue a writ of habeas corpus on a claim rejected on the merits in state court unless the petitioner surmounts high obstacles. The principal obstacle concerns the state court's legal determinations. To obtain federal relief on a claim that state courts rejected on the merits, the state courts' decision must have been "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). This court "reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

A decision is contrary to clearly established federal law "if it applies a rule that contradicts the governing law set forth" in Supreme Court decisions or "confronts a set of facts that is materially indistinguishable from" a Supreme Court decision but comes out differently. *Brown v. Payton*, 544 U.S. 133, 141 (2005). An "unreasonable" application of clearly established federal law must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citation omitted).

The petitioner must show that the state court's decision involved an error "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Another obstacle to federal relief concerns the state court's factual findings. A state court's factual findings receive deference if "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (internal quotations and citations omitted); see also *Dassey v. Dittmann*, 877 F.3d 297, 302–03 (7th Cir. 2017) (en banc). The petitioner must show by clear and convincing evidence that the findings were unreasonable. 28 U.S.C. § 2254(e)(1).

The general principles regarding coerced statements are well established. The Due Process Clause of the Fourteenth Amendment forbids the use of an involuntary statement against a criminal defendant. See *Miller v. Fenton*, 474 U.S. 104, 109 (1985). To determine if a statement was voluntary or not, courts evaluate the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Some relevant factors include the length and nature of the interrogation, the age and education of the suspect, and the psychological impact of the questioning on the defendant. *Id.* The defendant has the burden of establishing that statements were coerced. See *Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986).

A.  *Lynumn v. Illinois and its Successors*

Janusiak first argues that the state appellate court's decision was both contrary to and an unreasonable application of *Lynumn v. Illinois*, 372 U.S. 528 (1963), one of the Supreme Court's leading cases on the admissibility of confessions

extracted through threats or promises related to a suspect's children. In light of the fraught emotions that can arise when the police talk to a suspect about her children, we asked counsel at oral argument to address when and to what extent police officers could discuss children with a suspect during a custodial interrogation. Counsel suggested that officers may discuss children "in the context of an interview" but may not "use" them to manipulate a person into making statements. We first review what the Supreme Court and other circuits have ruled is not permissible in interrogations involving threats or promises concerning a suspect's close family members. We then turn to the merits of Janusiak's arguments.

We begin with three cases in which the police crossed the line to obtain confessions or concessions by threatening suspects with lost access to children or other close family members. The first is *Lynumn* itself, decided before *Miranda*. Officers arrested Lynumn for selling marijuana to a friend who had "set her up," and they "encircled" her at her home to question her there. 372 U.S. at 529, 534. During the questioning they threatened that "state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id.* at 534. Lynumn "had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." *Id.* The Supreme Court held that "a confession made under such circumstances must be deemed not voluntary, but coerced." *Id.*

The second case is *Haynes v. Washington*, 373 U.S. 503 (1963), also decided before *Miranda*. Officers arrested Haynes, took him to the police station, and refused to allow him to contact a lawyer or his wife despite "several specific requests"

to do so. *Id.* at 507. Haynes was told, however, that he might be allowed to contact a lawyer and his wife if he confessed. *Id.* Haynes then signed one incriminating statement, but the police continued to prevent him from contacting an attorney or his wife and did not advise him that he could remain silent. *Id.* at 508–11. Haynes was allowed to call his wife only "some five or seven days after his arrest." *Id.* at 512. The Supreme Court suppressed the confession because the police obtained it "with the express threat of continued incommunicado detention" if Haynes continued to resist and "the promise of communication with and access to family" if he relented. *Id.* at 514.

The third case with improper threats to cut off contact with close family members is *United States v. Ivy*, 165 F.3d 397 (6th Cir. 1998), where police entered a home to search for a fugitive. They did not find the fugitive, but they found Ivy and his girlfriend. The officers asked them for permission to search the house. After both refused, the police handcuffed the girlfriend by her leg to a table. The police also took and held the couple's baby while telling Ivy that he could either consent to the search or the police would arrest everyone in the house (including his girlfriend) and would take the baby into protective custody. See *Ivy*, 165 F.3d at 400–03. Ivy eventually allowed the police to search the home after they had threatened him and his girlfriend for an hour and a half. The search turned up some cocaine. The Sixth Circuit found that Ivy's consent to search was involuntary based on the totality of the circumstances. *Id.* at 404.

*Lynumn*, *Haynes*, and *Ivy* establish and illustrate what the police may not do. Many other cases, however, distinguish those cases based on key factual differences. For example, in

*United States v. Santiago*, 428 F.3d 699 (7th Cir. 2005), we distinguished *Ivy*, finding that the district court did not clearly err in finding consent to a search voluntary. The district court "did not actually find that the agents had threatened to arrest Santiago's fiancée and have their children taken into protective custody" if Santiago did not consent. *Id.* at 705.

Another example is *United States v. Hufstetler*, 782 F.3d 19 (1st Cir. 2015), which distinguished *Lynumn.* The police questioned a suspect who was concerned about the potential criminal liability of his girlfriend. Investigators told Hufstetler: "There's obviously different outcomes for [her], depending on what it is in the details that we're looking for here." *Id.* at 21. The officers also told Hufstetler "that they could not, and would not, promise [him] anything in exchange for his confession." *Id.* at 25. The First Circuit distinguished *Lynumn* because the police "never lied, exaggerated the situation, or conditioned either individual's release on Hufstetler's willingness to speak." *Id.* Rather, the police properly emphasized the "indisputably true fact" that Hufstetler's girlfriend could be criminally liable unless "new information came to light to discount her culpability." *Id.*

Within a single case on direct review, courts may suppress some statements and not others. In *United States v. Syslo*, 303 F.3d 860 (8th Cir. 2002), police questioned a couple involved in a bank robbery while their children were at the police station. The police told the wife during questioning that "she would not go to jail if she did not lie," to which she responded that she would consider lying to the officers "[i]f I didn't have my children to worry about." When questioning resumed later, the police told the wife "you're trying to protect yourself 'cause you know right now you're sitting on the line whether

you go to jail or you walk out of here with your kids." *Id.* at 864. The district court suppressed the wife's statements following that latter exchange but allowed the earlier statements. The wife pleaded guilty, and the Eighth Circuit affirmed. It explained that the wife's earlier statements were admissible because she voluntarily brought her children to the police station and because her statement that she would consider lying if not for the children "reveals independent and deliberate thought rather than an overborne will." *Id.* at 867.

When reviewing state-court decisions, the deferential standard of § 2254(d) requires federal courts to deny relief where reasonable jurists might disagree about police behavior involving statements about close family members. For example, in *Brown v. Horell*, 644 F.3d 969 (9th Cir. 2011), police interrogated a man suspected of murder. He had a pregnant fiancée, and he mentioned that her pregnancy was the best thing to happen to him in his life. *Id.* at 980. From that point on, the police "coerced Brown into confessing by conditioning his ability to be with his child on his decision to cooperate with the police." *Id.* For example, among the police officer's comments were "I can't imagine what would keep you from telling the truth with that little baby boy waitin' to be born," and "I think you are going to see your baby. I firmly believe that," as well as "Only reason I'm talking to you is cuz you got a baby on the way, and I'd like to see you get to be with that baby." *Id.* at 981. Even though officers "expressly conditioned Brown's ability to be with his child on his compliance with [the] questioning" and "deliberately prey[ed] upon … Brown's expression of his overwhelming desire to witness his child's birth," the Ninth Circuit affirmed denial of the petition. While the court "likely" would have reached a different result on direct review, it reasoned that other federal courts

had interpreted *Lynumn* "to mean that threats or promises relating to one's children or family … may be considered as part of the totality of the circumstances," and the totality in Brown's case did not clearly cross the line of coercion. *Id.* at 981–82 (internal quotation marks omitted).

*McCalvin v. Yukins*, 444 F.3d 713 (6th Cir. 2006), reversed the grant of a habeas petition in a murder case. During an interrogation into the death, which occurred from a car collision, McCalvin initially maintained that the victim's death was an accident. *Id.* at 715. One interrogator told McCalvin "that if she went to prison for first-degree murder, she would spend the rest of her life in prison and would not have contact with her family, including her children." *Id.* at 715–16. McCalvin then confessed. *Id.* at 716. The Sixth Circuit held that relief must be denied for several reasons: McCalvin had been warned of her rights under *Miranda* and had voluntarily waived her rights; *id.* at 720–21; the police may discuss with suspects "the seriousness of the crime for which they are being investigated," *id.* at 721; and "McCalvin was not made to fear more than the result of being convicted of first-degree murder," which necessarily included not being with her children every day, *id.* Fair-minded jurists could conclude, held the court, that the officers' statements were not impermissibly coercive. *Id.* at 720-21.

Another example is *Cooper v. Bergeron*, 778 F.3d 294 (1st Cir. 2015). There, a detective told Cooper that if he did not speak with the detective, he would see to it that a state agency would take his son away from his ex-wife. *Id.* at 297. Affirming the denial of relief under § 2254(d), the First Circuit said the state court "considered the impact of the detective's exploitation of the parent-child relationship in light of other

circumstances that evinced Cooper's clear-mindedness." *Id.* at 306–07. In particular, the state court evaluated the totality of the circumstances, including the effect of the threat to take away Cooper's child, and reasonably determined that Cooper's will was not overborne. *Id.* at 307–08.

Several lessons emerge from the *Lynumn* line of cases. First, explicit threats to eliminate or interfere with a suspect's custody of a young child unless the suspect provides satisfactory statements to the police are presumed to be coercive. See *Lynumn*, 372 U.S. at 534; *Ivy*, 165 F.3d at 402–03. The same is true of threatening the child's support from the state or conditioning future interactions on cooperation. See *Lynumn*, 372 U.S. at 534; *Brown*, 644 F.3d at 980–81; *Ivy*, 165 F.3d at 402–03.

Second, police are not forbidden from talking about a suspect's children. See *Hufstetler*, 782 F.3d at 23–24. Nor would that be practical. It is only natural for a criminal suspect to want to know what could happen with her children. When the suspect raises the matter, a police officer can avoid a later accusation of impermissible exploitation by avoiding the question with a truthful statement (e.g., "I don't know what will happen to your kids"). The police also can talk truthfully about the likely consequences for children when a parent is arrested, jailed, convicted, or imprisoned. See *Santiago*, 428 F.3d at 705 (holding that suspect who realized his family may be in legal jeopardy was not coerced into providing consent to search home when he negotiated commitment that his family be "kept out of this"); *McCalvin*, 444 F.3d at 721 (informing suspect of consequences of first-degree murder conviction, including separation from children and family, was not coercive but rather was accurate way of conveying "the seriousness of the crime").

Third, any statements about a child's custody should not be false; otherwise the suspect's will may be overborne by lies that have nothing to do with the strength of the evidence. See *United States v. Nichols*, 847 F.3d 851, 857 (7th Cir. 2017), quoting *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009); see also *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (noting false promises are relevant factor under totality of circumstances); *Hufstetler*, 782 F.3d at 25. False promises of leniency can render statements involuntary. See *Aleman v. Village of Hanover Park*, 662 F.3d 897, 906 (7th Cir. 2011); *United States v. Montgomery*, 555 F.3d 623, 629–30 (7th Cir. 2009) (investigator's misstatement of potential sentences "does not make the interrogation coercive, however, *especially when the purported sentence was not linked to* [*defendant's*] *willingness to talk to the investigators*" (emphasis added)); *Brown*, 644 F.3d at 981. Suspects may assume they will have access to their children as a form of leniency for cooperating, so such false promises may be particularly coercive. That possibility is heightened if the police make promises or threats they lack the power to carry out lawfully. See *Lynumn* 372 U.S. at 534 (suspect had "no reason not to believe that" police could carry out threat); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 482 (7th Cir. 2011) (in § 1983 suit, noting that "where an official makes a threat to take an action that she has no legal authority to take, that is duress"); *Brown*, 644 F.3d at 981.

Against this background, we turn to the specifics of Janusiak's arguments that the Wisconsin appellate court's decision is both contrary to and an unreasonable application of *Lynumn*. We conclude first that the state court's decision affirming her conviction is not contrary to *Lynumn* because the case is readily distinguishable on salient grounds. No officer suggested that Janusiak would lose custody of her children

(or that their state aid would be cut off) unless she confessed to the crime. Also, before the officers questioned Janusiak, they warned her of her right to remain silent and her right to consult with an attorney. See *Janusiak*, 367 Wis. 2d 349, ¶¶ 17–18; see also *Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). Finally, Janusiak had five prior convictions (albeit for relatively minor offenses), giving her some experience with the criminal justice system. See *Janusiak*, 367 Wis. 2d 349, ¶ 13. Janusiak's case is distinguishable from *Lynumn* on reasonable grounds.

The state court also did not unreasonably apply *Lynumn* to Coppernoll's comments and the handful of comments by the officers to Janusiak about her children. The questioners spoke the truth when they said that *if* Janusiak had harmed Payten, then she might lose custody of her children, and that if she did no harm, she could remain with them. They did not threaten that she would lose her children *unless* she confessed. *Janusiak*, 367 Wis. 2d 349, ¶¶ 22–25. Officers may discuss the true and serious consequences of arrest or incarceration. See *McCalvin*, 444 F.3d at 721. *Lynumn* does not require suppression because a suspect hears that the outcome of her case may result in the loss of custody of her children. *Lynumn* does not require suppression here, and at the very least, fair-minded judges could reach that conclusion. See *Richter*, 562 U.S. at 101.

Janusiak objects that the state court, in evaluating the comments of social worker Coppernoll, disregarded *Lynumn*. But the court discussed *Lynumn* when evaluating the officers' statements, and its rationale for finding Coppernoll's statements non-threatening was consistent with *Lynumn*. The court was not required to repeat its citation in the portion of its opinion about Coppernoll. See *Mitchell v. Esparza*, 540 U.S.

12, 16 (2003) (explaining that "state court need not even be aware of" Supreme Court precedents so long as its reasoning and result do not contradict them); *Gilbert v. Merchant*, 488 F.3d 780, 793 n.2 (7th Cir. 2007); see also *Johnson v. Pollard*, 559 F.3d 746, 754 (7th Cir. 2009) (describing *Lynumn*'s holding); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (same).

B.  *Miranda v. Arizona*

Janusiak next contends that the state court's decision is contrary to and an unreasonable application of *Miranda* itself. She argues that, by seeking exculpatory statements from Janusiak, Coppernoll and the officers violated the prohibition and principles set forth in this passage of *Miranda*:

> The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant…. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; … it does not distinguish degrees of incrimination. Similarly, … no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' … [S]tatements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be

> used without the full warnings and effective
> waiver required for any other statement.

384 U.S. at 476–77.

The state court's decision is not contrary to *Miranda*. Even though the officers and Coppernoll solicited exculpatory statements from Janusiak, they did so only after giving her *Miranda* warnings and receiving her valid waiver. The quoted passage holds that courts may not distinguish between exculpatory and inculpatory statements only to determine whether suppression is required when warning were not given. Because Janusiak received *Miranda* warnings, the state court's ruling did not contradict the principle in this passage.

The state court also did not unreasonably apply *Miranda*. When deciding that Coppernoll did not threaten Janusiak, the state court said: "if anything, Coppernoll's statements would most likely have had the effect of causing Janusiak to continue to deny that the baby was injured in any manner at her home, whether accidental or otherwise." *Janusiak*, 367 Wis. 2d 349 at ¶ 23. Such a denial, if unwarned, might be the kind of "exculpatory" statement that *Miranda* protects. See *Davis v. United States*, 512 U.S. 452, 457 (1994) (describing *Miranda*'s holding). But Janusiak received her warnings and voluntarily waived her privilege.

C. *Totality of the Circumstances*

Next, Janusiak argues that the state appellate court unreasonably applied the Supreme Court's totality-of-the-circumstances test by evaluating the circumstances of her interrogation "in complete isolation from one another." When, as here, different factors point in opposite directions, it is difficult to show that a state court's ruling that a statement was voluntary

was unreasonable under § 2254(d). See *Dassey*, 877 F.3d at 305, 313 (en banc); see also *Yarborough v. Alvarado*, 541 U.S. 652, 664–65 (2004) (habeas review is deferential where state courts have applied such general rules with leeway for case-by-case determinations).

The state court correctly recognized and reasonably weighed the pertinent circumstances. It observed that the interrogation was lengthy, cf. *Berghuis v. Thompkins*, 560 U.S. 370, 386–87 (2010), and that Janusiak was eight months pregnant, see *Kunik v. Racine Cty.*, 106 F.3d 168, 174–75 (7th Cir. 1997) (section 1983 suit). But it also recognized that she had a high-school education, prior experience with law enforcement, see *Bustamonte*, 412 U.S. at 226–27, *Miranda* warnings, and repeated breaks.

The court also reasonably viewed as non-coercive the officers' statements that Janusiak's stories did not match the medical evidence and that "you're not giving us anything to work with." First, those statements appear to have been factually correct. Second, even if the officers misled Janusiak or exaggerated what other evidence showed, those techniques do not render a confession involuntary. E.g., *Dassey*, 877 F.3d at 313, citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *United States v. Sturdivant*, 796 F.3d 690, 697 (7th Cir. 2015) ("[W]e have repeatedly held that a law-enforcement agent may actively mislead a defendant in order to obtain a confession, so long as a rational decision remains possible.") (alteration in original), quoting *Conner v. McBride*, 375 F.3d 643, 653 (7th Cir. 2004); *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here").

Janusiak counters that the state court assessed the significance of her personal characteristics in a section of its opinion separate from its evaluation of the officers' tactics. But the court assessed all the circumstances. The organization of its opinion does not show that it failed to weigh all the factors. See *Johnson v. Williams*, 568 U.S. 289, 300 (2013) (federal courts may not tell state courts how to write opinions). The state appellate court did not unreasonably apply the totality-of-the-circumstances test.

D.  *Factual Findings*

Finally, Janusiak contends that the state appellate court made two unreasonable factual findings. First, the court found that the officers "wait[ed] for her to stop crying and calm down before questioning her." *Janusiak*, 367 Wis. 2d 349, ¶ 20. Janusiak points out that she cried many times after questioning started. The state court recognized this. It said that the officers "did not appear to take advantage of her emotional state *when she cried in their presence*." ¶ 17 (emphasis added). The state court reasonably found that, before questioning began, Janusiak stopped crying. See *Brumfield*, 135 S. Ct. at 2277.

Second, the state appellate court wrote that the officers told Janusiak that "she could go home if she was able to provide an *exculpatory* explanation of the baby's injuries that did not contradict the medical evidence." *Janusiak*, 367 Wis. 2d 349, ¶ 27 (emphasis in original). Janusiak contends that the officers asked her for any "explanation," not just an exculpatory one, that matched the medical evidence. But in the context of their expressed desire to "send you home with your kids," it was not unreasonable to construe the officers' statement as a request for an explanation that would exonerate Janusiak.

In sum, the Wisconsin Court of Appeals' decision was not contrary to or an unreasonable application of clearly established federal law, nor was it based on any unreasonable factual finding. The district court's judgment denying Janusiak's § 2254 petition is

AFFIRMED.