In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2659

CHRISTY LENTZ,

*Petitioner-Appellant*,

*v.*

TERI KENNEDY,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cv-09516 — **Gary Feinerman**, *Judge*.

SUBMITTED JUNE 10, 2020[*] — DECIDED JULY 28, 2020

Before FLAUM, BARRETT, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. For nearly a week Christy Lentz feigned ignorance as she pretended to help investigators locate her missing father. Officers soon discovered the father's decaying body hidden at the office building the two shared,

---

[*] We granted the parties' joint motion to waive oral argument, and the appeal is therefore submitted on the briefs and the record. Fed. R. App. P. 34(a)(2)(C).

and all signs pointed to Lentz as the murderer. Lentz, with her young daughter in tow, voluntarily accompanied officers to the police station under the pretense of follow-up questioning for the missing persons investigation. For the first hour and a half, officers asked general questions, like when and where she last saw her father, to commit Lentz to her story. They then took a cigarette break. When the interview resumed, the tone changed. The officers read Lentz her *Miranda* rights and confronted her with the mounting evidence against her. Over the next four hours, Lentz slowly confessed to shooting her father.

In the state trial court, Lentz moved to suppress her videotaped confession but the court denied her motion. She proceeded to trial, where the confession was admitted into evidence, and a jury found her guilty of first-degree murder. The Illinois Appellate Court affirmed the conviction on direct review. Lentz then tried her hand at state postconviction proceedings but was unsuccessful.

Now on federal habeas review, Lentz claims the interrogation violated her constitutional rights in two ways: that she was "in custody" during the pre-*Miranda* portion of the interview, and that her confession was involuntary. Because our review is deferential and the state court's decision with respect to both issues was not an unreasonable application of clearly established federal law, we affirm the district court's denial of habeas relief.

## I. Background

We take the facts from the Illinois Appellate Court's opinion, *People v. Lentz*, 2011 IL App (2d) 100448-U (*Lentz I*).[1] The state court's findings are "presumed to be correct" and Lentz bears the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). She has not attempted to do so and the material facts related to the interrogation are generally undisputed, as the entire event was videotaped. Lentz challenges the application of clearly established law to those facts.

### A. General Background

Lentz's father, Michael Lentz, Sr., owned his own business, Industrial Pneumatics Supply—a pneumatic tools distributor—in Villa Park, Illinois. Lentz had worked for her father since she graduated high school. She first began as a secretary but over time her responsibilities at the business increased to include handling customer service, paying bills, balancing the checkbook, and paying taxes. At the time of the incident, the company had only one other employee besides Lentz and her father, a part-time secretary. According to Lentz, she was in the process of taking over the business from her father because he wanted to retire.

---

[1] *Lentz I* is the appellate court's decision on direct appeal, which addressed the suppression challenges that Lentz now raises in her federal collateral proceedings. Lentz also filed a state postconviction petition raising ineffective assistance of trial counsel claims, which resulted in a second appellate court decision, *People v. Lentz*, 2015 IL App (2d) 140888-U (*Lentz II*). The ineffective assistance of counsel claims are not before us and all of the facts relevant to the interrogation are found in *Lentz I*.

On June 9, 2006, Lentz and her sister, Jill Baker, asked the police to check on their father because they had not seen or heard from him since late May. The police opened a missing persons investigation and interviewed Lentz on June 14, 2006. A week later, on June 21, 2006, the police stopped by the business's office building. The door was locked and there was a handwritten sign saying that the business was closed due to a family emergency. The officers, however, noticed a smell of decomposition. They obtained a search warrant and searched the business, where they discovered Mr. Lentz's dead body in a wrapped and taped bundle head-down in a plastic bin. It also appeared that there had been unsuccessful attempts to burn the body in the bin.

Following this discovery, the police then went to the house of Chuck Minauskas, Lentz's boyfriend, and arrived just before 10:00 p.m. on June 21st, where they found Lentz, her seven-year-old daughter Taylor, and Minauskas. Lentz agreed to speak with the officers down at the Villa Park police station and the officers then transported all three there. Two detectives questioned Lentz over the course of approximately five and a half hours, the details of which we discuss below. They videotaped the entire interview. (A third officer was in the room operating the video camera.) In short, after about two hours of questioning, shortly before 2:00 a.m., Lentz admitted to killing her father. Over the next three and a half hours, until about 5:30 a.m., the detectives elicited more details about the shooting and cover-up. At the conclusion of her statement, Lentz was arrested and charged with murder.

Before trial, Lentz moved to suppress her videotaped statement. The Illinois trial court heard evidence and arguments related to the motion over the course of several days

between May and December 2008. The court denied the motion. Lentz then went to trial, during which the prosecution played the videotaped confession in full for the jury. The jury found Lentz guilty of first-degree murder, and the court sentenced her to fifty years' imprisonment. On direct appeal to the state appellate court, Lentz challenged the trial court's denial of her motion to suppress.

## B. The Illinois Appellate Court's Decision

Lentz made the two arguments on direct appeal that she raises on federal collateral review: (1) that the circumstances in which she gave her statement violated *Miranda v. Arizona*, 384 U.S. 436 (1966), because she was in a custodial setting once she went to the police station, but the officers did not give her the *Miranda* warnings until part way through her questioning; and (2) that even if her questioning did not violate *Miranda,* her confession was involuntary and should have been suppressed. *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 6.

### 1. The interrogation

The Illinois Appellate Court undertook an extensive review of the evidence presented at the suppression hearing and the entire videotaped interrogation. Its opinion was thorough and detailed. We have reviewed the video for ourselves as well, and add some facts or details where we deem helpful.

Villa Park police officer Tiffany Wayda was one of the officers assigned to the missing persons investigation for Lentz's father, Michael Lentz, Sr. She testified that on June 21, 2006, between 2 p.m. and 3 p.m., she and a fellow detective went to the father's business, where Lentz worked, looking for Lentz to get some phone records. No one was at the business, but after walking around the back of the building they

"noticed the smell of decomposition and saw flies near a window." *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 9. Wayda and her partner obtained a warrant to enter the building and search for a body, and returned to the building sometime between 4 p.m. and 7 p.m. Once they discovered the body in the building, they obtained a second search warrant for the entire premises. Wayda got back to the Villa Park police station at about 8:30 p.m.

Jordan Anderson is a Wood Dale police officer. On June 21, 2006, he was told to go to the Villa Park police station, where he and other officers were assigned to find Minauskas, Lentz's boyfriend. Anderson and three other officers drove together to Minauskas's home, while two other officers drove separately. Both cars were unmarked and all six officers were dressed in plain clothes, albeit with police identification. Anderson testified that the officers arrived at Minauskas's home at about 9:52 p.m. Upon arrival, officers encountered Minauskas, Lentz, and their seven-year-old daughter, Taylor, standing in the driveway. Anderson and another officer approached Lentz, and Anderson testified that he said, "Hi, Ms. Lentz. My name is Detective Anderson. I'm from the major crimes task force, and we'd like to talk to you in reference to the missing persons case that we're investigating." *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 10. He asked Lentz if she would come to the police station with him so they could talk there, and Lentz agreed but said that she would need to bring her daughter. Anderson agreed and offered to give them a ride to the station. According to Anderson, Lentz "did not display any hesitation in accompanying them to the police station." *Id*. Lentz and Taylor got into the back of one police car and four officers got into the same car (one on either side of them in the back seat and two in front). At the police station, Lentz

got out of the police car herself. She entered the police station through a secured door, not the front door that is open to the public.

The appellate court noted that the witnesses all "agreed that there was no 'cage' or secure divider between the back and front seats of either of the police cars." *Id*. ¶ 11. Furthermore, "[a]t no point did the police handcuff anyone, use physical force on anyone, or raise their voices." *Id*. "The officers did not say that anyone was under arrest." *Id*.

At the station, Wayda and fellow Villa Park police officer Todd Kubish interviewed Lentz. There was a third, unnamed officer in the room who operated the video recorder. "All of the officers were in civilian dress and none of them displayed their weapons at any point during the questioning." *Id*. ¶ 12. The video picks up with Lentz already talking, which Kubish explained was because the video operator was trying to get the recorder started and that the only discussion missed was Wayda introducing Kubish to Lentz.

The appellate court characterized Lentz's demeanor at the start of the tape as "relaxed and helpful." *Id*. ¶ 13. They began to discuss the last time that Lentz saw her father and her father's business in general. She described her role as handling "a little bit of everything," including shipping, receiving, the books, and customer services. *Id*. She stated that her father recently made her the president of the company and that he wanted to retire soon.

At this point, now about five minutes into the interview, Kubish stopped the conversation and told Lentz that he had forgotten to ask her something. The following discussion then took place:

Q. [Kubish] Tonight, how did you get here today?

A. [Lentz] They transported us here.

…

Q. And the officers asked you if you would be willing to come in here?

A. Uh-huh.

Q. You weren't forced to come in here or anything like that?

A. No.

Q. Nobody dragged you out of the house?

A. No.

Q. Nobody threatened you to come in here?

A. No.

Q. And you know why we're here, right? We're here to talk about your father?

A. Right.

Q. That he's missing, correct?

A. Right.

Q. I just wanted to make sure.

A. No, that's fine. That's great.

*Lentz I*, 2011 IL App (2d) 100448-U, ¶ 14. Kubish then stated that the date was Wednesday, June 21st, and the time was 11:10 p.m. He noted that Lentz had something to drink (she had a visible bottle of water on the table) and asked if she needed anything, a bathroom break or pizza or anything, Lentz said no. This quick exchange occurred:

Q. [Kubish] Okay, good. All right. So everything's okay?

A. [Lentz] My daughter needs to go to bed soon.

Q. Okay. [laughs] I'm sure she's being very occupied.

A. I'm sure.

*Id*. The appellate court's transcription seems to indicate that Kubish laughed, but a review of the video reflects that it is Lentz who actually laughs after she says that her daughter needs to go to bed soon. We further note that, when Lentz replies "I'm sure," she is smiling and does not have a sarcastic tone.

Kubish then resumed the questioning, "asking open-ended questions in a non-confrontational manner." *Id*. ¶ 16. The appellate court noted parenthetically that Lentz "laughed periodically throughout the first two hours of questioning, often in a manner indicating rueful agreement with what the officers said." *Id*. The interview continued for approximately an hour and a half. They discussed her father's personality, his personal life, the state of the business, and Lentz's activities since her father went missing.

At 12:30 a.m., Kubish paused the conversation, asked for the time, and then announced the time and date (it was now June 22nd) and stated that they needed to switch the tape so they were going to take a break. Lentz then asked, "Is there any way that I could take my daughter home soon to put her to bed? Because it's kind of late." *Id*. ¶ 20. Kubish responded, "Well, we're just trying to get through all this now, so—" and then the tape stopped. *Id*.

The break lasted for thirty-two minutes, during which time Lentz went to the bathroom and went outside to have a cigarette. "Kubish and Wayda, who were both smokers, accompanied [Lentz] outside and [Lentz] smoked a couple of cigarettes," though it was "not clear if either of the officers also smoked a cigarette during the break." *Id*. When the tape resumed, Kubish announced that it was now 1:02 a.m. and also noted for the record that Lentz saw her family members while outside:

Q. [Kubish] And when you were outside you saw Mike, your brother Mike?

A. [Lentz] My brother Mike and Howard.

Q. And Howard is your—

A. Brother-in-law.

Q. And he's married to?

A. My sister Jill.

Q. Jill. Okay. And you saw your daughter down there sleeping?

A. Yes.

Q. Okay.

A. On the park bench. Getting bit by mosquitos, yes.

Q. [Wayda] Is she sleeping outside?

A. Yes.

Q. I'm sure she'll go back inside when they go back inside. Does Howard smoke?

A. Yes.

Q. So they'll probably bring her back inside.

Kubish then resumed the questioning, asking about Lentz's presence at the business earlier that day. A few minutes later, at 1:07 a.m., Kubish switched gears and took out a *Miranda* waiver form. *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 22. He told Lentz that he was "going to go over a couple things with [her] real quick." Kubish then read each *Miranda* right on the form to Lentz and asked if she understood each one, to which she affirmed after each one and again at the end that she understood all of them. Lentz signed the waiver form next to each right. She also signed the bottom of the form acknowledging that she understood all of her above rights, waiving her rights, and agreeing to willingly make a statement.

Both officers then questioned Lentz in a "slightly more confrontational manner" regarding various inconsistencies and discrepancies in stories, phone records, bank records, and conversations with other witnesses. *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 22. Wayda commented that it was difficult to get a straight story from Lentz because "nothing matches" any of the actual documents the officers had collected. At 1:39 a.m., the officers took a quick one-minute break to step out of the room to get some additional information from another room. "When they returned, Kubish said that they had spoken with the secretary, who told them that she had not been at work since May 15th, and that [Lentz] had been calling her and telling her not to come in because [Lentz] was doing inventory and her father was crabby." *Id*. ¶ 23. Kubish then began to press Lentz about her statement that she had not noticed anything "strange or unusual" at the office when she was there earlier in the day—hinting at the smell of decomposition. *Id*. Lentz played dumb and pretended not to know what the

officers were talking about, but she "could not explain the air fresheners and the white powder all over the floor, or what they were for." *Id*. Wayda repeatedly pleaded with Lentz to tell the officers "what's going on."

The officers took another one-minute break at 1:47 a.m. to change the videotape. When the interview resumed at 1:48 a.m., "Kubish and Wayda began pressing the defendant again to tell them what was going on" and why the office smelled the way it did. *Id*. ¶ 24. The officers also began asking if someone else was involved in what happened. Kubish also suggested that "maybe it wasn't [her] fault" and asked if her father "did something to [her]." Lentz "became emotional and reflective." *Id*. "She said that her father had pulled a gun on her at work a few weeks ago, and had hit her in the past. He had come to her house and said he would put her in jail and beat her; she didn't know why. Other people did not know about it." *Id*. After the officers again asked her to tell them what was going on, Lentz "hesitated and said that she would probably never be able to see her daughter again." *Id*. Both officers immediately told Lentz that that was not true. This is the exchange that took place:

> Wayda: … Get this weight lifted off of you. Tell us what happened.
>
> Lentz: I'm probably never going to be able to see my daughter again.
>
> Kubish: That's not correct.
>
> Wayda: No, that's not true.
>
> Kubish: That's not true.

Lentz then told the police that her father came at her with a gun and she pushed him and he shot himself, and she "freaked out." This admission came approximately forty-five minutes after the officers had given her the *Miranda* warnings and about two hours and twenty-five minutes into the interview. She then related the events leading up to the fight and how it occurred. According to Lentz, she had not told her brother or sister or Minauskas. No one else knew.

The officers expressed disbelief that Lentz could have done all that was done with the body by herself, but Lentz insisted that no one else was involved and no one else knew. She had driven her father's truck to Kenosha and left it by the side of the road, and took the bus back. The gun was in her dad's desk drawer. The officers continued to ask more questions to draw out more details, but Lentz was reluctant to speak. She mostly stared down at the table, holding her head in one of her hands, and only gave short verbal responses. After a few minutes, Kubish told Lentz that he knew she felt bad about what happened and that if she did not do anything wrong, there was nothing for her to hide. He also reminded her that she initially called the police for help:

A. [Lentz] I know, but what about my daughter?

Q. [Kubish] Obviously, we're going to take care of your daughter. We're going to do the right thing. But you need to do the right thing. I can't tell you what's going to happen with your daughter until you tell me what happened with your dad. I mean turn, look at me.

A. I'm obviously not going to be able to see her.

Q. No, you are going to be able to see her. Once we get this straightened out, you can see your daughter.

A. I can't go home with her.

Q. Well, we need to know what happened. Listen, look at me. You can't look at me right now because you're not being completely honest with us.

*Lentz I*, 2011 IL App (2d) 100448-U, ¶ 24. Kubish went on to say that they needed to know "why this happened" and needed more details surrounding the clean-up. Lentz, at times, became emotional and cried, and also occasionally put her head down. The questioning continued until approximately 5:30 a.m. "Kubish and Wayda agreed that at no point during the interview did they tell the defendant that she was free to leave, although in the beginning they did not consider her to be under arrest." *Id*.

### 2. *Custodial interrogation*

In determining whether Lentz was "in custody" at the time she gave her statement, because *Miranda* applies only to custodial interrogation, the appellate court considered the following relevant circumstances:

(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused.

*Lentz I*, 2011 IL App (2d) 100448-U, ¶ 8 (citing *People v. Slater*, 886 N.E.2d 986, 995 (Ill. 2008)). The appellate court's "own review of the record" led it to agree with the trial court that the

"majority of the relevant factors favor a finding that the de-
fendant was not in custody during the pre-*Miranda* portion of
the interview." *Id*. ¶ 26. The court balanced the factors as fol-
lows:

- <u>First Factor</u>: location, time, length, mood, and mode
  of the questioning. "The questioning took place at
  a police station, in a conference room in a portion
  of the building not open to the general public." *Id*.
  But the appellate court found that because Lentz
  "knew that the police wanted to talk to Minauskas
  at the same time and would want to do so sepa-
  rately, the location of the questioning would not be
  especially suggestive of custody to a reasonable
  person." *Id*. The time also did not weigh in favor of
  custody even though the questioning took place
  during the late evening and early morning hours
  because there was "no indication" that "the police
  chose the time in an attempt to make the defendant
  more vulnerable." *Id*. Rather, the questioning took
  place "as soon after the discovery of the body as
  practicable." *Id*. As for the mood and mode of the
  questioning, the appellate court, like the trial court,
  placed "great weight on these factors" and found
  that "both the tone of the questions being asked and
  the defendant's relaxed demeanor demonstrated a
  cooperative and voluntary interview rather than a
  custodial interrogation." *Id*.

- <u>Second Factor</u>: number of police officers present
  during the interrogation. The appellate court found
  that this factor was "neutral" because three officers
  was a "usual number for interviews" and "they

were in civilian clothes with their weapons secured in their customary holsters." *Id*. ¶ 27. Further, only two of the officers questioned Lentz while the third officer operated the videotape recorder.

- <u>Third Factor</u>: presence or absence of family and friends of the individual. The appellate court did not address or weigh this factor.

- <u>Fourth Factor</u>: indicia of a formal arrest procedure. Simply, "none of the indicia of a formal arrest were involved, such as the show of weapons or force, physical restraint, booking or fingerprinting." *Id*.

- <u>Fifth Factor</u>: manner by which the individual arrived at the place of questioning. This factor favored a finding that Lentz was in custody because "the presence of six police officers at Minauskas' home, four of whom accompanied the defendant back to the station, might lead a reasonable person in the defendant's position to conclude that he or she did not have a choice whether to go with the police officers." *Id*. ¶ 28.

- <u>Sixth Factor</u>: the age, intelligence, and mental makeup of the accused. This factor favored the finding of a noncustodial interview because Lentz "was not a minor and does not appear to have had any difficulty in understanding the nature of the questioning." *Id*. ¶ 27. Although Lentz argued on appeal that she was tired because she had been "awake since 4:45 a.m. the previous morning" and "had been in the bar for some hours that afternoon," based on the videotape Lentz, "while

occasionally appearing tired, was alert and ori-
ented throughout the questioning and did not
show any impairment to her ability to understand
the proceedings." *Id*.

In the end, three factors weighed in favor of finding a noncus-
todial interview, one factor weighed in favor of finding Lentz
was in custody, and one factor was neutral.

Lentz, however, emphasized that the officers never told
her that she was free to leave. The appellate court found the
argument unpersuasive in this case because "the videotape
shows the defendant agreeing with Kubish that she had vol-
untarily consented to come to the station and answer ques-
tions." *Id*. ¶ 29. There was "no[] need to reassure the defend-
ant that she was free to go: the defendant clearly viewed her-
self as being in control of her own presence at the station." *Id*.
Similarly, Lentz's comment before the first break that she
would need to take her daughter home soon "was delivered
in a tone indicating that she was telling the police that she
could not stay all night and would eventually have to leave—
a communication that was consistent with a belief that she re-
mained free to terminate the interview." *Id*. Lentz's "manner
throughout the pre-*Miranda* portion of the question[ing] was
that of someone voluntarily cooperating with the police in an
effort to locate her missing father." *Id*. "Finally, we do not
view the fact that Kubish and Wayda accompanied the de-
fendant outside while she smoked to be suggestive of cus-
tody; the police testified that otherwise the defendant could
have gotten lost or locked out." *Id*. And Lentz's demeanor re-
mained "relaxed and cooperative even after the break, sug-
gesting that she was not intimidated by Kubish's and
Wayda's presence outside while she smoked." *Id*.

Thus, "viewing all of the factors together" and "taking all of the circumstances into account," the appellate court concluded that Lentz "was not in custody during the pre-*Miranda* portion of the questioning." *Id*. Therefore, "the failure of the police to warn her of her constitutional rights at the outset of the questioning did not violate *Miranda* and her statements were not subject to suppression on that basis." *Id*.

### 3. *Voluntariness of the confession*

Lentz's second argument was that, even if the questioning did not violate *Miranda,* the court nonetheless should have suppressed her inculpatory statements because they were involuntary. *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 31. Similar to the "in custody" determination, in considering whether a confession is voluntary, a court must consider the totality of several factors, including: "(1) the defendant's age, intelligence, experience, education, mental capacity, and physical condition at the time of questioning; (2) the legality and duration of the detention; (3) whether the suspect was given *Miranda* warnings; (4) the duration of the questioning; and (5) the existence of any physical or mental abuse." *Id*. ¶ 32.

Lentz argued that "the police impermissibly used her desire to take her daughter home to coerce her into confessing to accidentally causing her father to shoot himself." *Id*. ¶ 33. She asserted that Kubish and Wayda "repeatedly referred to her daughter in encouraging her to 'tell us what happened' and 'be honest.'" *Id*. She argued that the "cumulative effect of this use of Taylor's presence at the police station, coupled with her tiredness and the length of the interrogation, wore her down to the point that her will was overborne and her confession was not voluntary." *Id*.

"A close look at the record refutes this argument." *Id*. ¶ 34. During the pre-*Miranda* portion of the questioning, Lentz's daughter Taylor was mentioned three times:

- The first mention occurred shortly after questioning began, when Kubish asked whether the defendant needed food, water, a bathroom break, or anything else. At that point, the defendant told Kubish that Taylor would need to go to bed soon. Her tone of voice on the videotape indicates that she was advising the detectives that she was willing to cooperate and answer questions regarding her missing father but she would eventually need to get Taylor home to bed.

- The second mention occurred an hour and a half later, after Kubish said that they would need to take a break to change the tape. The defendant asked whether she could take Taylor home "soon" to put her to bed, indicating that she would like to wrap up the questioning at some point in the near future although not necessarily right then. Kubish did not respond directly, stating that they were "just trying to get through all this now." The defendant did not say anything further about Taylor.

- The police and the defendant then went outside for a half-hour break. Immediately after the break, Kubish made a record of the break, noting that while she was outside the defendant saw her daughter asleep and other family members nearby. The

> defendant agreed, but voiced a concern that Taylor
> was being bitten by mosquitos. Wayda reassured
> her that the other family members would bring
> Taylor back inside when they were done smoking.

*Id*. In each of these three instances, it was Lentz who brought up her daughter and the officers responded only indirectly.

Next, about five minutes after the smoke break, Kubish read Lentz her *Miranda* rights and she signed the waiver form. Approximately forty-five minutes after receiving the *Miranda* warnings, Lentz stated, "You know, I'm probably never going to be able to see my daughter again." *Id*. ¶ 35. "Kubish and Wayda both immediately responded, 'that's not true.'" *Id*. This is then the point where Lentz first stated that her father had come at her with a gun and she had pushed him away and that he had shot himself as he fell. "Between the time that the defendant received the *Miranda* warnings and the time she expressed concern about seeing Taylor as she was preparing to tell the police how her father was shot, the defendant did not indicate that she was concerned about Taylor in any way or wished to see her." *Id*. ¶ 35.

The questioning continued, with Kubish and Wayda "repeatedly suggest[ing] that the defendant, who was small in stature, had help from others, possibly her brother or Minauskas, in handling her father's body and disposing of the truck near Kenosha." *Id*. ¶ 36. As the officers "continued to press the defendant hard on this point, urging her to tell them the full story and be truthful," Lentz then asked Kubish what would happen with her daughter. *Id*. Kubish responded "that they would take care of her daughter and do the right thing, but that he could not tell her what was going to happen with

Taylor long-term until she told him what happened with her father." *Id*. "After that, Kubish and Wayda referred to the defendant's concern for Taylor more often—a total of eight more times—in urging the defendant to give them a full and truthful account." *Id*. "Although the defendant appeared increasingly tired and stressed during the remaining questioning, at no point did she change her account of any of the significant details of the story that she had told the officers." *Id*.

Therefore, the appellate court concluded that "[t]his record does not support the defendant's argument that her statement was the product of police coercion relating to whether she could see Taylor or take her home." *Id*. ¶ 37. To the contrary, when Lentz commented about Taylor having to go to bed soon, "the police reassured the defendant that Taylor was being cared for." *Id*. And when Lentz expressed fear that she would never see Taylor again—immediately before making her first inculpatory statement—"the officers unanimously told her that was not true." *Id*. "Thus, there was no coercive use of Taylor's presence or the defendant's concern for her prior to her confession that she was involved in her father's shooting and attempted to cover up his death." *Id*.

Finally, the appellate court made it a point that it "do[es] not condone the officers' later statements that they could not tell the defendant what would happen to Taylor until the defendant had provided a full and truthful statement, the defendant has not identified any manner in which those statements caused her to change her story or provide any substantial new information." *Id*. Thus, the court found that Lentz's statements were voluntarily and freely given.

The Illinois Appellate Court affirmed the judgment of the state trial court. *Id*. ¶ 48. The Illinois Supreme Court denied Lentz's petition for leave to appeal.

## C. State Court Postconviction Proceedings

Following her direct appeal, Lentz filed a petition for relief pursuant to the Post–Conviction Hearing Act (Act), 725 ILCS 5/122–1. *See Lentz II*, 2015 IL App (2d) 140888-U, ¶ 2. The trial court granted the state's motion to dismiss the petition without an evidentiary hearing, and Lentz appealed. In her state court postconviction appeal, she argued that the trial court improperly dismissed her petition because she made a substantial showing that she was deprived of her right to effective assistance of trial counsel. The appellate court affirmed the dismissal. *Id*. ¶ 65.

The issues raised in her state postconviction proceedings—ineffective assistance of counsel—are not at issue in this habeas appeal and we say no more about them.

## D. Federal Habeas Proceedings

Having exhausted her state court remedies, Lentz then turned to federal court and filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In her petition, Lentz raised two claims: (1) the introduction of her videotaped statement at trial violated her Fifth and Fourteenth Amendment rights; and (2) her trial attorney was ineffective.

On the first issue, the district court found that the Illinois Appellate Court's decision that she was not in custody during the pre-*Miranda* portion of the questioning was reasonable and that "state court thoroughly applied the general, multifactor *Miranda* custody test to Lentz's case. At the very least, its decision was reasonable." The district court also concluded

that the appellate court reasonably applied federal law when it determined that her statement was voluntary. On the ineffective assistance of trial counsel claim, the district court also found that the state court reasonably applied *Strickland* and that it did not make any unreasonable determination of the facts.

The district court denied a certificate of appealability. Lentz filed a notice of appeal and a request for a certificate of appealability, which we granted only with respect to her claim that "the admission of her videotaped statement into evidence might have violated her constitutional rights under the Fifth and Fourteenth Amendments."

## II. Discussion

Lentz presents two issues on appeal, both concerning her videotaped statements. First, Lentz argues that she was in custody prior to her *Miranda* warning and therefore should have been read her rights before any questioning. And second, she asserts that her statements were not made voluntarily. With respect to both arguments, Lentz contends that the state court erred because its decision was contrary to clearly established federal law.[2]

We review the district court's decision de novo, but our habeas review is otherwise significantly limited. *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc). Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant habeas relief only if a state court adjudication on the merits (1) "was contrary to, or involved an

---

[2] Though Lentz also asserts the state court unreasonably determined facts in her statement of the issues and argument headings, she does not identify any specific factual determinations that were erroneous.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). An unreasonable application of clearly established federal law must be "objectively unreasonable." *White v. Woodall*, 572 U.S. 415, 419 (2014). We accord great deference to the state courts' determinations. *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc).

"[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," this presents a "straightforward inquiry" for the federal habeas court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The Illinois Appellate Court was the last reasoned decision on the merits, and thus we focus on that decision and "simply review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable." *Id*. We do not ask whether we agree with the state court decision, or even whether the state court decision was correct. *Dassey*, 877 F.3d at 302. The sole question for the federal courts is "whether the decision was unreasonably wrong under an objective standard." *Id*. Even if the petitioner presents "a strong case for relief," the state prisoner is entitled to federal habeas relief only if "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011). This standard is meant to be difficult to meet and is reserved for the "rare" case. *Dassey*, 877 F.3d at 302.

In our narrow review, we conclude that the Illinois Appellate Court did not unreasonably apply established United States Supreme Court precedent and did not make any unreasonable determination of the facts.

## A. Custodial Interrogation

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of being questioned while in custody, the Supreme Court in *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Those safeguards include a warning, prior to questioning, that the suspect has a right to remain silent and a right to the presence of an attorney. *Id*. Importantly, by "custodial interrogation" the Court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. In *Miranda* caselaw, "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).

The most basic question of the "in custody" determination is whether given the "objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322–23 (1994) (per curiam), a "reasonable person [would] have felt he or she

was not at liberty to terminate the interrogation and leave," *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 U.S. at 509 (citations omitted). The freedom-of-movement inquiry, however, is not the end-all be-all. "Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id*. Instead, the focus is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*. If a defendant is in custody but is not warned of his constitutional rights, "no evidence obtained as a result of interrogation can be used against him." *Miranda*, 384 U.S. at 479.

Furthermore, under § 2254(d)(1) habeas review, "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id*. The *Miranda* "in custody" inquiry is a general standard, so its application to a specific case can "demand a substantial element of judgment." *Id*.

Lentz contends that "at the point that [she] and her daughter were transported to the station, the objective circumstances indicated she was under arrest and not free to terminate her encounter with police." She focuses on the number of officers who arrived at Minauskas's home (six) and who drove her and her daughter to the police station (four). At the station, the officers separated Lentz from her daughter and

placed her in a "non-public room." Two officers questioned her while a third officer videotaped the interview. She asserts that when she "asked permission to take Taylor home, the officers avoided her request." And while at the station she was "accompanied at all times," including "by multiple officers when she went outside to smoke." According to Lentz, a reasonable person would not have felt free to terminate the interview. These were all factors, though, that the appellate court expressly took into account and found that, on balance, did not make the interview custodial. That was not an unreasonable application of *Miranda*.

She also alleges that the Illinois Appellate Court "completely failed to take into account the fact that the officers did not allow [Lentz] to drive herself to the station; that the officers did not allow her to make arrangements for her seven-year-old daughter's care; and that when she arrived at the station she was separated from Minauskas and, more importantly, her daughter." This characterization does not do justice to the court's opinion. The appellate court discussed in detail all of the relevant facts surrounding the interview in its background discussion. *See Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012) (finding state court did not fail to consider facts that were discussed elsewhere in opinion). Specifically, regarding the initial encounter at Minauskas's house, the court noted:

> [Officer Anderson] asked the defendant to come to the police station with him so that they could talk to her there. The defendant said fine, but she would need to bring her daughter. Anderson agreed and offered the defendant a ride to the police station, saying that they would bring her back when they were done. The

> defendant did not display any hesitation in accompanying them to the police station.

*Lentz I*, 2011 IL App (2d) 100448-U, ¶ 10. To say on habeas review that the state court failed to take into account certain facts that the court specifically acknowledged in its opinion strains credulity. We have no reason to doubt that the Illinois Appellate Court adequately considered all of the relevant facts and circumstances in its final custodial analysis, repeating only those that it deemed necessary.

Though Lentz may disagree with the state court's weighing of certain facts, the highly deferential habeas review does not permit a federal court to conduct its own independent inquiry and reweigh factors as a de novo matter. "The issue is not whether federal judges agree with the state court decision or even whether the state court decision was correct." *Dassey*, 877 F.3d at 302. The "only question that matters under § 2254(d)(1)" is whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). In this case, the Illinois Appellate Court's opinion extensively reviewed all of the circumstances surrounding the interrogation and weighed all of the proper "in custody" factors. Even if "certain facts weigh against a finding that [Lentz] was in custody" and "[o]ther facts point in the opposite direction," this does not make the appellate court's decision an unreasonable application of federal law. *Alvarado*, 541 U.S. at 664–65. Fairminded jurists may well disagree over whether Lentz was in custody, but these differing indications lead us to hold that the state court's application of the in-custody standard was not an unreasonable application of federal law. *Id*. at 665. The custody test is general, and the Illinois Appellate Court's

application of federal law fits well-within the Supreme Court's prior decisions. We cannot grant habeas relief on this basis.

**B. Voluntariness of the Confession**

The Fourteenth Amendment's guarantee of fundamental fairness forbids the admission of an involuntary confession into evidence in a criminal prosecution. *Miller v. Fenton*, 474 U.S. 104, 109–10 (1985). The test for voluntariness asks, "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). In making that determination, courts assess the "totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation." *Id*. One such relevant circumstance, significant here, is the "psychological impact on the accused." *Id*. at 226. Voluntariness is a general standard, and as such applying it "can demand a substantial element of judgment." *Dassey*, 877 F.3d at 303 (quoting *Alvarado*, 541 U.S. at 664). "The more general the rule, the more leeway courts have in reaching outcomes in case–by–case determinations." *Id.* (quoting *Alvarado*, 541 U.S. at 664). We afford the Illinois Appellate Court's voluntariness conclusion such leeway here.

Lentz maintains that the officers used her concern for her daughter as an interrogation tactic to coerce her confession, thus rendering it involuntary. The Illinois Appellate Court's determination that her confession was voluntary, she argues, is contrary to *Lynumn v. Illinois*, 372 U.S. 528 (1963). In *Lynumn*, the defendant confessed "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" *Id*. at 534. The Court held that it was "clear" that

these threats, delivered while the police officers encircled the defendant, produced an "impellingly coercive effect" that made the confession involuntary. *Id*. at 534–35.

Recently, we addressed a similar habeas appeal, wherein the defendant alleged that her confession was involuntary because the police made comments about keeping custody of her children. *Janusiak v. Cooper*, 937 F.3d 880 (7th Cir. 2019). We noted "the fraught emotions that can arise when the police talk to a suspect about her children," and thus set out to review Supreme Court precedent and our circuit's law regarding the discussion of children during custodial interrogations. *Id*. at 888. "Several lessons emerge from the *Lynumn* line of cases." *Id*. at 891. First, explicit threats to a suspect's custody of a young child are presumed to be coercive. *Id*. Second, however, "police are *not* forbidden from talking about a suspect's children." *Id*. (emphasis added). And third, "any statements about a child's custody should not be false; otherwise the suspect's will may be overborne by lies that have nothing to do with the strength of the evidence." *Id*. at 891–92.

Turning to Lentz's case, at the threshold the Illinois Appellate Court's ruling is not contrary to *Lynumn*. Unlike *Lynumn*, no officer here suggested that Lentz's daughter would be "taken away" unless she confessed to the crime. Even under Lentz's own characterization of the facts—that "the detectives refused [her] repeated attempts to make arrangements for the proper care of her daughter"—these tactics still are not similar to those employed in *Lynumn* because the officers did not condition the custody or care of the child on cooperation and did not make explicit coercive threats. Thus, the state court's decision is not contrary to *Lynumn*

because Lentz's case is distinguishable on reasonable grounds. *See Janusiak*, 937 F.3d at 892.

The appellate court's decision was also not an unreasonable application of *Lynumn* to the officers' comments about Lentz's daughter. At the outset, before Lentz confessed, the court noted that when Lentz initially expressed that her daughter needed to go to bed the officers "reassured [Lentz] that Taylor was being cared for" and that both officers immediately told Lentz it was "not true" when she lamented she would never see her daughter again. *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 37. The state court's finding that these pre-confession comments were not coercive is consistent with the *Lynumn* line of cases.

After Lentz first confessed, though, she again asked what would happen to her daughter and Kubish told Lentz "that they would take care of her daughter and do the right thing, but that he could not tell her what was going to happen with Taylor long-term until she told him what happened with her father." *Lentz I*, 2011 IL App (2d) 100448-U, ¶ 36. Specifically, Kubish stated, in part: "I can't tell you what's going to happen with your daughter until you tell me what happened with your dad." We find this statement troubling. It straddles the line of impermissibly conditioning the care or well-being of the suspect's child on the suspect confessing. Importantly, however, Lentz confessed before the officer made this problematic comment and, moreover, Lentz did not "change her story or provide any substantial new information" afterwards. *Id*. ¶ 37. Given this, whatever pressure the officer's statement may have placed on Lentz, we cannot say that the Illinois Appellate Court's determination that it did not have a compellingly coercive effect was an unreasonable application

of federal law. That said, we agree with the appellate court, and stress, that "we do not condone the officers' later statements that they could not tell the defendant what would happen to Taylor until the defendant had provided a full and truthful statement." *Id*.

Following that disconcerting statement above, the officers referred to Lentz's concern for her daughter "more often—a total of eight more times." *Id*. ¶ 36. The state court carefully reviewed and evaluated all of those comments in its opinion but found that none of these references were coercive in nature. Though Lentz attempts to frame some of the comments as "expressly condition[ing] Taylor's wellbeing" on Lentz telling the officers what they wanted to hear, that is not a fair reading of those statements. The officers pleaded with Lentz to tell them the truth and told Lentz to "think about" her daughter. The police are not forbidden from talking about a suspect's child and the officers' generalized statements here fall squarely within bounds of permissible familial commentary: "When the suspect raises the matter, a police officer can avoid a later accusation of impermissible exploitation by avoiding the question with a truthful statement (e.g., 'I don't know what will happen to your kids')." *Janusiak*, 937 F.3d at 891.

We think that a review of the videotaped interrogation readily demonstrates that the officers did not leverage Lentz's daughter to compel her confession. But we need not even go that far. "When reviewing state-court decisions, the deferential standard of § 2254(d) requires federal courts to deny relief where reasonable jurists might disagree about police behavior involving statements about close family members." *Janusiak*, 937 F.3d at 890. At the very least, it is enough that fairminded

judges could reach the Illinois Appellate Court's conclusion that Lentz's confession was voluntary. We must therefore defer to that decision and deny habeas relief.

### III. Conclusion

Lentz confessed to shooting her father over the course of a five-and-a-half-hour interrogation. She maintains that any statements she made before she received her *Miranda* warnings should have been suppressed and that her confession was involuntary because the officers used her daughter's well-being to coerce the confession. The Illinois Appellate Court considered all of the circumstances surrounding Lentz's confession and reviewed the videotaped interrogation, and determined that Lentz was not in custody during the pre-*Miranda* portion of the interview and that her confession was voluntary despite any references that the police officers made about her daughter. Our habeas review is narrow and because the state court's decision did not involve an unreasonable application of clearly established federal law, the district court's judgment denying Lentz's petition for a writ of habeas corpus is

AFFIRMED.